The STATE of Ohio, Appellee,

v.

ECHOLS, Appellant.

[Cite as *State v. Echols* (1998), 128 Ohio App.3d 677.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–970272.

Decided June 26, 1998.

684

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for appellee.

*Linda S. Bolin*, for appellant.

PAINTER, Judge.

## I. FOURTEEN COUNTS FOR THE PRICE OF ONE

The state argued, in part, that taxpayers could save money by trying appellant Lonnie Curtis Echols on six counts of robbery, six counts of aggravated robbery, and two counts of kidnapping in a single trial. We recognize that multiple criminal charges may be joined in a single trial under Crim.R. 8(A) and that joinder can, in some instances, serve the purposes for which the rule was created—"to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses."[1] This was not such an instance.

Conservation of judicial resources was the only purpose arguably served by joinder under the facts of this case. Neither the possibility of incongruous results (which would usually be in the case of multiple defendants, not multiple charges) nor inconvenience to witnesses (as different witnesses testified to different counts) was implicated here. When the need to conserve judicial resources is balanced against Echols's right to a fair trial, the right to a fair trial must prevail. Thus, we conclude that joinder of all fourteen charges in one trial was prejudicial in this case.

Our determination does not necessarily mean that each charge against Echols must be tried separately, only that the trial court should closely examine the charged offenses and join for trial only those offenses that demonstrate *modus operandi* with those that are so simple and distinct that there is little danger that the jury will use the evidence in a cumulative, corroborating manner. We reverse Echols's convictions and remand this cause for a new trial. We begin our analysis with the facts.

## II. THE SIX ROBBERIES

### A. Circle K I

On March 24, 1996, a man entered the Circle K store in the Corryville area of Cincinnati, Ohio, wearing a brownish-gray stocking cap pulled over his face, past his nose. The clerk working that evening could see the man's eyes through the almond-shaped eyeholes cut in the cap, as well as the uncovered part of his face beginning with the top of his upper lip. Along with the cap, he wore a brownish-gray jacket with a double racing stripe down one arm and dark baggy work pants. The man approached the counter with a purposeful, quick, smooth stride

---

1. *State v. Schaim* (1992), 65 Ohio St.3d 51, 58, 600 N.E.2d 661, 667.

and pulled a six-inch, black-handled serrated knife with a sharp tip from his jacket pocket. The clerk noticed the man's large, rough, dry hands. Holding the knife, the man demanded money from the cash register drawer and warned the clerk not to touch the "bait" money. (Bait money is money that activates a camera when pulled from the cash drawer.) After taking money and food stamps, the man left.

The clerk noticed that the man had not been wearing gloves and that he put or slid his hands on the counter and touched the front door. So after the man left, the clerk covered the counter to protect any fingerprints that might have been left and to prohibit any other prints from being left. She stated that "the only other fingerprints" that would have been on the counter would have been hers. The police dusted for fingerprints.

While the clerk noted that the man did not have a goatee or glasses, she did not know whether he had a mustache, gold caps on his teeth, or any missing teeth. (While Echols may be missing teeth or have a gold tooth, nothing in the record demonstrates this.) In her report to the police, she described the thief as a black male in his twenties, approximately five feet, eight inches tall and one hundred forty pounds. Following the incident, she provided a written description of the man and drew a sketch of the knife.

On May 7, 1996, the clerk identified Echols as the robber, after viewing him in a line-up. She based her identification on his voice, his hands, his build, and his skin tone. The police preliminary investigation report contained on the back a notation by Cincinnati Police Officer Condo in reference to the line-up identification. It stated, "Very Strong ID–Not Positive Due To Face Being Partially Covered."

## B. Circle K II

On March 27, 1996, a man swiftly walked into the same Corryville Circle K store. He wore a thin paper cap, resembling a surgical hair cap, pulled over his face. The cap had eyeholes cut into it and was held in place by a two-colored baseball cap with writing. The man wore dark jeans and a black or navy winter jacket. The clerk working the shift could see through the "mask" that the man had a mustache, but could not recall whether he wore glasses. The man walked to the counter and demanded money from the clerk, including the roll of quarters she had just opened. From his jacket, he pulled a knife with a thick blade approximately six inches long and one to two inches wide. The clerk described the man as broad-shouldered, approximately five feet, ten inches tall and weighing one hundred fifty to one hundred sixty pounds. She described his hands as rough, with a "working" look, and "kind of veiny." Later, upon seeing a

composite drawing, she informed the police that the man might have been in the store previously as a customer.

She identified Echols at the May 7 police line-up by his voice and face. A notation on the back of the preliminary investigation report by Officer Condo referred to the line-up identification as "[n]ot Positive Due To Face Being Covered But Very Strong On # 2." (Echols was the second person in the line-up.) She stated that a knife and jacket shown to her by the police were "positively" *not* the knife and jacket she saw on the night of March 27.

## C. Church Parking Lot—Two Victims

On the morning of April 10, 1996, in a church parking lot in Mt. Auburn, a woman was "supervising" her husband as he changed a flat tire on her car. A man approached the woman from her side and demanded money. He placed a knife first in her ribs and then to her throat and threatened to kill the woman unless the husband gave him money. They informed him they had no money. The woman, however, told the man that there was money in their other car, parked approximately six vehicles away. The woman proceeded to her car, with the man following her. At the car, she retrieved her purse and handed him her wallet. The man emptied it, took the cash, and walked away, while the woman observed.

The woman described the robber as a twenty-five-year-old black man, approximately five feet, eight inches or five feet, ten inches tall and clean-shaven. He was not wearing glasses. He was wearing a green knit cap, pulled down to his eyebrows, a buttoned-up black and red flannel shirt, and dark pants. Her husband testified that the robber was five feet, ten inches to six feet tall and weighed less than one hundred seventy pounds. He said the robber wore a mostly red shirt with black checks or stripes and a dark green knit cap lowered to his eyebrows. He was not wearing glasses and was clean-shaven. He described the knife as resembling a kitchen or restaurant knife, and stated it had a black handle and a fairly long steel blade at least six inches long. In the police report, he described the robber as a twenty-five-year-old black male, approximately five feet, eight inches tall and weighing one hundred sixty pounds.

Later, police officers showed both victims a composite drawing and a photograph array. The victims stated that the composite resembled the robber, but were unable to identify him from the photographs, none of which depicted Echols. The husband identified Echols as the robber at the May 7 line-up, based on Echols's face and voice pattern. Following the line-up, the husband also identified a shirt recovered from Echols's apartment as one similar to that worn by the robber. The wife also identified Echols as the robber at the line-up.

### D. Dry Cleaner

In the afternoon on March 13, 1996, a man entered a dry-cleaning business located in Corryville, walked to the back, and showed the cashier a knife. They returned to the front of the business where the cash register was located, and he had the woman open the cash drawer. The man took money and checks. He then walked her to the back of the store, bound her arms and legs with a black ribbon, and made her lie on the floor. Upon hearing him leave, she "scooted" to the front door and began screaming. The man, who was at the door, shoved her back inside, despite her attempts to hold the door closed, and landed on top of her. She kept screaming. When others came to her aid, the man jumped up and ran out the front door.

The cashier testified the man was wearing a black baseball cap with a "Fila" logo, black jeans, and a purple, green, and aqua jacket, which she subsequently identified at trial. She stated he weighed about one hundred sixty pounds. He was not wearing glasses and had a "shadow" of a mustache. She described the knife as a kitchen knife with a four-inch blade and a brown handle.

Following the incident, she helped the police prepare a composite drawing of the thief. The written description provided by the cashier described the robber as a black male, in his late twenties or thirties, with a medium brown complexion and the start of a mustache. It estimated him to be between five feet, ten inches and six feet tall and to weigh one hundred sixty to one hundred eighty pounds. His face was described as sunken with very high cheekbones and possible dark marks. The cashier subsequently identified Echols in the May 7 line-up.

On March 14, 1996, Cincinnati Police Officer Brickler, walking in the direction in which the victims of the Circle K and dry-cleaner robberies stated the robber had escaped, discovered a cap in the yard and a jacket in the recycling bin of a house located on McMillan Street in an area between the dry cleaner and Echols's apartment. The cashier at the dry cleaner subsequently identified the clothing as that worn by the thief. Seven days after finding the clothing, Brickler stopped Echols on the street, identified himself as a police officer, and asked him some questions. Echols also permitted Brickler to photograph him. Brickler did so because Echols fit the description of the person who robbed the dry cleaner.

### E. Futon Store

Sometime after noon on May 5, 1996, a fairly attractive black man entered a futon store in Clifton, wanting to buy some pillows. He spoke to the woman working at the time, who quoted him prices. She described him as wearing a cap, unpleated khaki pants, a dark tricolored short-sleeved plaid dress shirt and "beat up" yellow leather work boots. He was not wearing glasses. She did not see his teeth or his hands. Upon receiving the price quotations, he left. At

approximately 3:50 p.m., he returned, stating that he wanted the pillows. As she was filling out an invoice, he pulled a knife and said, "Be cool, Baby." She began screaming, and the man ran without taking anything. She described the knife as a paring or kitchen knife, long and skinny, not serrated, and somewhat "curvy." She did not see the handle because his hand covered it.

When the police arrived, she informed them that the robber was a black male, approximately thirty years of age, six feet, one inch tall, and of slim build. The police officers also had her view two men fitting her description as the men stood across the street from the store. She identified neither as the robber. The police showed her a photograph array, from which she identified Echols.

The police went to Echols's apartment, based upon the photograph identification, and received permission from Echols to search his apartment. There they recovered a red and black checked flannel shirt, an eight-inch black-handled knife, a pair of tan work boots, a tan and blue Michigan ball cap, a pair of unpleated khaki pants, and two multicolored shirts of different sizes.

Echols was taken in the backseat of the police cruiser to the futon store, where he was viewed and identified by the female clerk approximately one hour after the incident. He was dressed in black jeans and a black leather jacket. She identified Echols as the thief because he had the same expression, eyes and cheekbones as the robber. She later identified the pants, boots, knife, and possibly the cap recovered from Echols's apartment as items worn or handled by the robber. (At trial, she was unable to identify that same knife.)

Officer Condo took fingerprint samples at the Circle K, the dry-cleaning business, and the futon store. He lifted six "usable" fingerprints from the Circle K store and five from the futon store. None of the prints matched Echols's or the victims' prints. Further, except for the pretrial identification of the knife recovered from Echols's apartment by the woman at the futon store, none of the other victims identified the knife as that used by the robber.

Echols testified that he was forty-three years old, stood six feet, one inch tall and weighed two hundred twelve pounds. The state presented evidence that his height and weight varied in several different documents, other than the victims' statements, in which he had been described. He wore glasses at trial and testified that he did not have small dark spots on his face. He also testified that he had degenerative arthritis in both his knees, which caused them to be stiff, and for which he took medication. He testified that he had been employed at the time of the robberies, that he frequented the Circle K store, both to shop and to use the telephone, and that he had spoken with both clerks at various times. He testified that, on the day of the robbery of the dry-cleaning business, he cleaned the yard of his girlfriend's mother and then watched television with her brother at his house. This was partially corroborated by his girlfriend's mother. On

May 5, 1996, he claimed that he was watching the NBA playoffs on television, except for a brief time when he went to the grocery store to buy some food.

## III. THE CONVICTION

The state indicted Echols on six counts of robbery, six counts of aggravated robbery, and two counts of kidnapping, all of which were accompanied by a specification of a prior first-degree aggravated felony conviction. (The indictment also contained a charge for receiving stolen property, which the state dismissed.)

Following the jury's verdict of guilty on all counts, the trial court found Echols guilty of the specification attached to each of the aggravated robbery counts. The trial court convicted Echols and sentenced him to ten to twenty-five years on each aggravated robbery count and on each kidnapping count, with the sentences to run consecutively, with ten years' actual incarceration on each count. The trial court correctly merged the robbery counts with the aggravated robbery counts for sentencing purposes.

## IV. THE APPEAL

Echols raises seventeen assignments of error. In his first two assignments of error he claims, respectively, that the trial court abused its discretion by failing to allow expert testimony on eyewitness identification and that the court erred by denying his motion for relief from prejudicial joinder. In his third and fourth assignments, Echols argues that the trial court erred in sentencing him on the kidnapping count because the victim was unharmed and that he was denied effective assistance of counsel because counsel failed both to request a jury instruction regarding the release of an unharmed kidnapping victim and to object to the sentence imposed.

Echols's fifth, seventh, twelfth, and thirteenth assignments of error all raise arguments concerning the fairness of the line-up resulting in his pretrial identification and the court's alleged errors in failing to strike his in-court identification and testimony relating to the pretrial identification. Echols's ninth assignment asserts that the trial court erred in admitting an in-court identification following an unconstitutional show-up. Assignments six, eight, and ten all concern ineffectiveness of counsel for failing to object to testimony and in-court identification based on the allegedly unfair pretrial identification.

Echols claims in his eleventh assignment of error that the trial court erred in denying his motion for acquittal on the charge of aggravated robbery of the futon store. In his fourteenth assignment, he argues that his convictions were against the manifest weight and sufficiency of the evidence. In his fifteenth and

sixteenth assignments, Echols claims that the trial court erred by not ruling on his motion to suppress in-court identification and that he was denied effective assistance of counsel because counsel did not demand a hearing on the motion. In his last assignment of error, Echols claims that the trial court erred in sentencing him for both aggravated robbery and kidnapping because they were, in this case, allied offenses of similar import.

## V. TO JOIN OR NOT TO JOIN, THAT IS THE QUESTION

We first address Echols's argument that the trial court erred by denying his motion for relief from prejudicial joinder. The state charged Echols with fourteen counts in one indictment, excluding the dismissed count. Echols moved to sever the counts for trial primarily by the dates of the incidents, except, for some reason, he requested that one of the kidnapping counts be tried separately from its accompanying robbery and aggravated robbery counts. Echols made his motion both before trial and after the state's evidence.

Crim.R. 8 allows for joinder of offenses in the same indictment if the offenses charged are of same or similar character. Joinder of offenses, however, "solely because they are of a same or similar character creates a greater risk of prejudice to the defendant." [2] A defendant may be afforded protection from the prejudice of such a joinder by seeking severance of the offenses under Crim.R. 14.[3] In this case, Echols sought severance of the offenses, arguing that having a single trial for all counts was prejudicial because the jury would inevitably consider evidence of all the incidents in reaching a verdict for any one offense, thus having his guilt turn on evidence which would be inadmissible if each incident were tried separately. In his motion, he also raised concerns about the cumulative effect of one jury hearing the evidence on all the counts. The trial court denied Echols's motion because the offenses occurred in the "same geographical area," close in time, and were "committed with the same method." It appears from the discussion on the record that the trial court determined that joinder would not be prejudicial because under Evid.R. 404(B), evidence of the other offenses would be admissible in each case, even if they were tried separately, to prove Echols's identity as the perpetrator.

Echols claims that the trial court erred by refusing to sever the offenses. To prevail, he must affirmatively demonstrate that (1) his rights were prejudiced by the failure to sever, (2) he provided the court sufficient information to allow it to weigh the benefits of joinder against his right to a fair trial, and (3)

---

**2.** *State v. Schaim,* 65 Ohio St.3d at 58, 600 N.E.2d at 667, fn. 6.

**3.** *Id.*

the trial court abused its discretion by refusing to sever the charges for trial given the information it had been provided.[4] Prejudice is negated, however, if the evidence admissible for each count would have been admissible in the trial of the other counts under Evid.R. 404(B), or if the evidence as to each count was sufficiently separate and distinct.[5] The defendant has the burden to demonstrate that a joinder is prejudicial.

### A. *Modus Operandi*—Any Way You Slice It, It Takes More Than a Knife To Create a "Behavioral Fingerprint"

There is no dispute that Echols provided the court with sufficient information to balance the benefits of joinder against his right to a fair trial. Thus, we initially focus our analysis on whether joinder prejudiced Echols. The state argued that joinder did not prejudice Echols because the evidence from each of the crimes would have been admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" at the trials of the other crimes, if the crimes had been tried separately.[6]

Admission of other-acts evidence is strictly limited because of the substantial danger that a jury will find a defendant guilty solely because it believes a defendant has a propensity to commit criminal acts or deserves punishment regardless of whether he committed the charged offense.[7] As the Ohio Supreme Court has stated, "This danger is particularly high when the other acts are very similar to the charged offense."[8] Therefore, other-acts evidence is admissible only if "there is substantial proof that the alleged other acts were committed by the defendant" *and* such evidence tends to show one of the matters enumerated in Evid.R. 404(B).[9] Obviously, for other-acts evidence to be admitted, both prongs must be satisfied. Failure to meet one defeats the use of such evidence.

In this case, the trial court arguably allowed joinder because the evidence of the various incidents ("other acts") would be admissible in any one case to prove identity. Such evidence can be used to prove identity in two

---

**4.** *State v. Schaim*, 65 Ohio St.3d at 59, 600 N.E.2d at 668.

**5.** *State v. Wiles* (1991), 59 Ohio St.3d 71, 77, 571 N.E.2d 97, 108, certiorari denied (1992), 506 U.S. 832, 113 S.Ct. 99, 121 L.Ed.2d 59.

**6.** See Evid.R. 404(B).

**7.** *State v. Schaim*, 65 Ohio St.3d at 59, 600 N.E.2d at 668.

**8.** *Id.*

**9.** *State v. Lowe* (1994), 69 Ohio St.3d 527, 530, 634 N.E.2d 616, 619.

situations: (1) if the other acts are inextricably interwoven or related to the alleged criminal act (for example, if in a bank robbery the perpetrator also physically assaulted a teller, and was charged with aggravated robbery and felonious assault, those two crimes would not be severed for trial), or (2) if they involve a "unique, identifiable plan of criminal activity" so as to establish a *modus operandi* or a "behavioral fingerprint."[10] The other acts in this case do not fall into the first evidence-of-identity category because the evidence as to any one of the counts was not necessary to provide a complete picture of any other count.[11] Thus, evidence of the other counts would have been admissible in a trial for any particular count only if the evidence showed a *modus operandi* identifying Echols as the perpetrator in each.

Very seldom is evidence of different crimes sufficiently similar to be a behavioral fingerprint. One case that does rise to that level is *State v. Knight*.[12] In *Knight*, the grand jury indicted a Cincinnati police officer on six counts of bribery and four counts of sexual battery. The trial court determined that the counts would be tried in four separate trials, with each trial limited to the allegations of each of the four victims. Prior to the first trial, which involved three counts of sexual battery and three counts of bribery, the state filed a notice of intent to introduce other acts involving the three other victims. The officer filed a motion to exclude all evidence of the acts involving the other three victims, which the trial court granted. This court reversed the trial court's decision, concluding that the evidence presented a textbook example of a behavioral fingerprint. In each situation, the officer, while acting in his official capacity, stopped a woman on minor or nonexistent offenses and then used either the offense or an outstanding warrant to procure sexual favors from the woman. The similarities were striking, especially because of the unusual nature of the crimes.

Having reviewed the evidence in this case, we conclude that all the joined offenses did not share "significant common features" sufficient to establish a *modus operandi*.[13] Although the crimes occurred in the same geographical area at knifepoint, there was a great deal of variance among the robberies. The use of a different knife was described in each situation. In only one situation did the robber threaten to kill the victim. In another, the robber bound the victim's arms and legs. In two incidents, the robber attempted to disguise his face. In

---

10. *State v. Lowe*, 69 Ohio St.3d at 531, 634 N.E.2d at 620.

11. See *State v. Thompson* (1981), 66 Ohio St.2d 496, 498, 20 O.O.3d 411, 412–413, 422 N.E.2d 855, 856.

12. (June 5, 1998), Hamilton App. No. C–970563, unreported, 1998 WL 299314.

13. See *State v. Lowe*, 69 Ohio St.3d at 532, 634 N.E.2d at 620.

the others, the robber made no attempt to do so. One incident occurred in a parking lot, in the early morning, and involved both a man and a woman. In another situation, the robber pretended to be a customer and spent time in the store familiarizing himself with the store and the woman on whom he ultimately pulled a knife. In other situations, there was no obvious casing of the situation. While some of the offenses may have been joined because the evidence of each demonstrated a "unique, identifiable plan of criminal activity," *i.e.*, the Circle K robberies, the same is not true of all the offenses. Especially unlike the others is the robbery of the couple changing the tire. We simply do not have a behavioral fingerprint here.

### B. Simple and Distinct or Confused and Misused

 Regardless of the inadmissibility of other-acts evidence, Echols's claim of prejudice also could not be defeated on the theory that the evidence of each count was "simple and distinct."[14] (The Ohio Supreme Court has used "simple and distinct" and "simple and direct" interchangeably.) We have reviewed the history of this test by examining Ohio Supreme Court cases which discuss the test and the federal cases upon which those cases rely.[15] The object of the "simple and distinct" test is to prevent the jury from improperly considering evidence of various crimes as corroborative of each other.[16] "[T]he very essence of this rule is that the evidence be such that the jury is unlikely to be confused by it or misuse it." [17] Generally, under the simple-and-distinct test, if the evidence of each offense is direct and uncomplicated, it is presumed that the trier of fact is capable of segregating the proof and not cumulating evidence of the various offenses being tried.[18]

 While cumulation of the evidence may be reduced if the evidence of each crime is simple and distinct, the possibility of jury hostility or the inference

---

**14.** See *State v. Schaim*, 65 Ohio St.3d at 59, 600 N.E.2d at 668; *State v. Lott* (1990), 51 Ohio St.3d 160, 163, 555 N.E.2d 293, 298, certiorari denied (1990), 498 U.S. 1017, 111 S.Ct. 591, 112 L.Ed.2d 596.

**15.** See, *e.g.*, *State v. Schaim, supra; State v. Wiles, supra; State v. Lott, supra; State v. Brooks* (1989), 44 Ohio St.3d 185, 542 N.E.2d 636; *State v. Hamblin* (1988), 37 Ohio St.3d 153, 524 N.E.2d 476, certiorari denied (1989), 488 U.S. 975, 109 S.Ct. 515, 102 L.Ed.2d 550; *State v. Torres* (1981), 66 Ohio St.2d 340, 20 O.O.3d 313, 421 N.E.2d 1288; *State v. Roberts* (1980), 62 Ohio St.2d 170, 16 O.O.3d 201, 405 N.E.2d 247, certiorari denied (1980), 449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102.

**16.** *State v. Wiles*, 59 Ohio St.3d at 77, 571 N.E.2d at 108; *State v. Van Sickle* (1993), 90 Ohio App.3d 301, 306, 629 N.E.2d 39, 43.

**17.** *Drew v. United States* (C.A.D.C.1964), 331 F.2d 85, 93.

**18.** *State v. Brooks* (1989), 44 Ohio St.3d 185, 542 N.E.2d 636.

of guilt from belief in the defendant's criminal disposition is still substantial when offenses are joined.[19] Thus, "[g]reat care must be exercised to protect the defendant from this possibility when joinder is tolerated under this theory."[20] If convictions are obtained based on the jury's combination of the proof offered on all offenses, when the evidence if considered separately would not be sufficient to sustain all the convictions, the convictions are improper and joinder is prejudicial.[21] It is the inappropriate combination of evidence of all the offenses that concerns us in this case.

Obviously, to determine whether joinder was prejudicial to Echols, we must review the record "in the light of what actually occurred after the consolidated trials went forward, not merely in terms of what might have been a proper course for the court to have pursued when the motions respecting consolidation were made."[22]

A review of the record shows that the state's opening statement set the stage for confusion. The state intertwined the evidence, stating that all six victims had something in common—a rather large man demanding property at knifepoint. Testimony of the police officers indicated that they were investigating the robberies as a series of robberies, using information from all the robberies, and believed that the perpetrator was one man. In its closing argument, the state told the jury, "Consider them separately, because I don't think you need to ignore the type of guy who takes on a group of women with a knife." The jury concluded Echols was guilty of each count. The record indicates that testimony concerning the offenses was combined on occasion. Based on this record, we conclude that it is not improbable that the jury confused the offenses, cumulated the evidence, and considered the evidence of the robberies as corroborative of each other.[23] Once again, our conclusion would not prohibit the joinder of offenses if the evidence of the joined offenses were so dissimilar that there would not be a danger of confusion. In light of the above, we conclude that Echols was prejudiced by the joinder of the fourteen counts in one trial.

---

**19.** *Drew v. United States, supra.*

**20.** *Id.,* 331 F.2d at 91.

**21.** See *State v. Torres,* 66 Ohio St.2d at 343–344, 20 O.O.3d at 314–315, 421 N.E.2d at 1291, citing *United States v. Ragghianti* (C.A.9, 1975), 527 F.2d 586.

**22.** *Dunaway v. United States* (C.A.D.C.1953), 205 F.2d 23, 25. Accord *State v. Schaim, supra* (where appellate court confuses evidence adduced at trial, it is impossible to maintain the fiction that the jury was capable of keeping the evidence separate).

**23.** See *State v. Van Sickle, supra.*

In addition, to carry the "same and similar" and "separate and distinct" tests to their extreme, as proposed by the dissent, would emasculate both rules—if a charge was not the same, it would be separate—and it would be difficult to conceive of any cases that could not be joined.

▆▆▆ We also conclude that the trial court abused its discretion in refusing to sever the counts where the evidence of the offenses, as presented to the trial court, failed to demonstrate a similar scheme, plan, or system sufficient to demonstrate a *modus operandi,* and where the likelihood that the jury would misuse the evidence was substantial.

## VI. THE "EYES" DO NOT ALWAYS HAVE IT

Echols requested that the court appoint Dr. Solomon M. Fulero as an expert witness in eyewitness identification to assist him in preparing his defense. The trial court granted Echols's motion, and Dr. Fulero's videotaped deposition was taken. At trial, the state objected to the testimony being admitted, claiming that Dr. Fulero's testimony invaded the province of the jury. The trial court agreed and did not allow the jury to hear Dr. Fulero's testimony. The trial court excluded the testimony because it invaded the province of the jury and because Ohio does not recognize a learned-treatise exception to hearsay.

▆▆▆ Evid.R. 702 and 704 allow for the admission of expert testimony "on 'an ultimate issue to be decided by the trier of fact' if the witness is qualified as an expert with 'scientific, technical or other specialized knowledge' and if his testimony or opinion will assist or help the trier of fact to understand the evidence or to decide an issue of fact."[24] (Citations omitted.) The Ohio Supreme Court has determined that expert testimony concerning the variables that may impair the accuracy of a typical eyewitness identification is admissible.[25] The testimony of an eyewitness-identification expert is inadmissible, however, regarding the credibility of a particular eyewitness's identification testimony, absent evidence of some special impairment of that witness.[26]

### A. Assistance is not Invasion

▆▆▆ The trial court in this case determined that Dr. Fulero's testimony concerning such areas as common misconceptions of laypersons about eyewitness

---

24. *State v. Baker* (1993), 92 Ohio App.3d 516, 533, 636 N.E.2d 363, 374; *State v. Haley* (July 25, 1997), Greene App. No. 96–CA–50, unreported, 1997 WL 435692.

25. *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795, paragraph one of the syllabus, certiorari denied (1986), 479 U.S. 871, 107 S.Ct. 240, 93 L.Ed.2d 165.

26. *Id.* at paragraph two of the syllabus.

identification, the effect of salient details on the accuracy of identification, factors affecting a witness's ability to recall, the processes by which a person acquires, retains, and retrieves visual information, and the effect of postevent information on identification invaded the province of the jury. It is unclear whether the trial court believed that such testimony would invade the jury's domain because the information could affect the jury's determinations of credibility or because the testimony would not help the jury reach an accurate decision. In either case, the trial court was wrong.

Evid.R. 704 allows for expert testimony even if it "embraces an ultimate issue to be decided by the trier of fact." Dr. Fulero's testimony concerned, generally, the variables that may affect eyewitness identification. His testimony did not apply the variables or discuss the credibility of an individual witness's identification. Thus, the jury would have been free to make its own credibility determinations and draw its own inferences, using all, part, or none of the testimony presented by Dr. Fulero. His testimony would not have invaded the jury's province as the arbiter of fact and credibility.

Further, Dr. Fulero's testimony would have been very helpful to the jury because his knowledge, as demonstrated by his deposition, was outside the scope of a layperson's knowledge and could dispel misconceptions about eyewitness identification. Dr. Fulero's testimony included information regarding the confidence of an eyewitness in his identification being unrelated to the accuracy of the identification, the manner in which memory functions, the inverse relationship of stress and accuracy of identification, the effect of familiarity of an individual in a different context on identification, and the inaccuracy of cross-racial identification, to name a few examples.

It has long been recognized by courts that eyewitness identification *may be* untrustworthy.[27] Thus, in a situation where a case turns on identification, the trial court should be vigilant in allowing the jury to have the best understanding of the hazards of such testimony. Obviously, in a case like this one, where the state's case was based primarily on eyewitness identification, where Echols's identity was at issue, where the victims were strangers or possibly had seen Echols only as a customer in the past, where all the witnesses are white and Echols is black, and where all the victims had the stress of being accosted with a weapon, Dr. Fulero's testimony would have been very helpful in assisting the jury to evaluate the evidence.[28]

---

**27.** See *State v. Chapple* (1983), 135 Ariz. 281, 660 P.2d 1208; *United States v. Smith* (C.A.6, 1984), 736 F.2d 1103, certiorari denied (1984), 469 U.S. 868, 105 S.Ct. 213, 83 L.Ed.2d 143.

**28.** See *State v. Buell; State v. Chapple, supra; United States v. Downing* (C.A.3, 1985), 753 F.2d 1224.

698

## B. A Book and an Expert are Not the Same

The trial court also excluded the testimony of Dr. Fulero because his knowledge was based, in part, on the work of other people, and because Ohio does not recognize a learned-treatise exception to the hearsay rule. While it is true that the Ohio Rules of Evidence do not incorporate a learned-treatise exception to the hearsay rule, as do the Federal Rules of Evidence, the learned-treatise exception is not applicable to Dr. Fulero's testimony. In Ohio, use of a learned treatise is limited to impeaching an expert who has relied upon the treatise or acknowledged it as an authority, by demonstrating the expert's unawareness of or unfamiliarity with its contents.[29] Consequently, an expert is not allowed to directly quote from or mention the titles of articles or treatises.[30]

References to studies by other experts in a field do not make an expert's testimony inadmissible as a learned treatise. "[I]t is perfectly proper for an expert to rely upon 'facts or data * * * perceived by him,' Evid.R. 703, as well as to draw upon knowledge gained from other experts in the field, whether this knowledge was communicated orally or in writing. This information forms the 'scientific, technical, or other specialized knowledge' which qualifies the witness as an expert. Evid.R. 702."[31] Otherwise, experts would be limited to hands-on experience to form the basis of their opinions—this has never been the case. Most expert learning is derived from reading or study of others' written work. Dr. Fulero's testimony merely referred to studies done by other experts as providing a partial basis for his knowledge on eyewitness identification. This is consistent with Evid.R. 702 and 703 and does not bring into play any learned treatise. To the extent any particular statement might have violated the Ohio Rules of Evidence, however, the trial court should have stricken the statement as inadmissible.

The deposition transcript clearly establishes that Dr. Fulero has a Ph.D. in psychology and is a licensed attorney. He is chairperson of the psychology department at Sinclair College and clinical director of the Center for Forensic Psychiatry. He has specialized in the field of human memory as it relates to the psychology of eyewitness identification or eyewitness memory. He has published in the field and is on the editorial board of the official journal of the American Psychology and Law Society. He has been elected to be part of a scientific

---

29. *Stinson v. England* (1994), 69 Ohio St.3d 451, 633 N.E.2d 532, paragraph two of the syllabus.

30. *Pool v. Wade* (1996), 115 Ohio App.3d 449, 456, 685 N.E.2d 791, 795.

31. *Kane v. Ford Motor Co.* (1984), 17 Ohio App.3d 111, 112, 17 OBR 173, 174, 477 N.E.2d 662, 664.

review committee to put forth a scientific paper on the state of the art on pretrial identification procedures. He has testified as an expert between fifty-five and sixty times on the issue of eyewitness identification. Evid.R. 702(B) explains that an expert is qualified by "specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony." Dr. Fulero's testimony clearly met these requirements.

## C. An Abuse of Discretion Clarified

We recognize that our standard of review for this assignment of error, like our review of the previous assignment on joinder, is whether the trial court abused its discretion. We believe it did in this case, where the only evidence connecting Echols with the robberies was eyewitness identification, and where there was no other substantial evidence linking him to the crimes.[32] The trial court's conclusion that Dr. Fulero's testimony constituted a learned treatise, would not be helpful to the jury, and would invade its province was unsupported by the record and legally incorrect. In explaining our determination, we quote the Supreme Court of Arizona's excellent explanation of what abuse of discretion means in this situation:

"The term 'abuse of discretion' is unfortunate. In ordinary language, 'abuse' implies some form of corrupt practice, deceit or impropriety. Webster's Third New International Dictionary (1976). In this sense, the application of the word to the act of a trial judge who ruled in accordance with all the decided cases on the issue is inappropriate. However, in the legal context, the word 'abuse' in the phrase 'abuse of discretion' has been given a broader meaning. In the few cases that have attempted an analysis, the ordinary meaning of the word has been considered inappropriate and the phrase as a whole has been interpreted to apply where the reasons given by the court for its action are clearly untenable, legally incorrect, or amount to a denial of justice.

"The law would be better served if we were to apply a different term, but since most appellate judges suffer from misocainea, we will no doubt continue to use the phrase 'abuse of discretion.' Therefore, we should keep some operative principles in mind. Something is discretionary because it is based on an assessment of conflicting procedural, factual or equitable considerations which vary from case to case and which can be better determined or resolved by the trial judge, who has a more immediate grasp of all the facts of the case, an opportunity to see the parties, lawyers and witnesses, and who can better assess the impact of what occurs before him. Where a decision is made on that basis, it

---

**32.** See *State v. Buell; State v. Haley; United States v. Downing;* and *United States v. Smith, supra.*

is truly discretionary and we will not substitute our judgment for that of the trial judge; we will not second-guess. Where; however, the facts or inferences.from them are not in dispute and where there are few or no conflicting procedural, factual or equitable considerations, the resolution of the question is one of law or logic. Then it is our final responsibility to determine law and policy and it becomes our duty to 'look over the shoulder' of the trial judge and, if appropriate, substitute our judgment for his or hers. This process is sometimes, unfortunately, described as a determination that the trial judge has 'abused his discretion.' In that sense, we determine that this trial judge did."[33] (Citations omitted.)

Similarly, the Ohio Supreme Court has defined "unreasonable" in the context of the abuse-of-discretion standard to be "no sound reasoning process that would support" a trial court's decision.[34] In the same sense as discussed above, the trial court in this case abused its discretion.

■ We agree with the Supreme Court of Arizona's analysis that the "abuse of discretion" term, especially its prong of "unreasonable," is a misleading term. We believe that the Ohio Supreme Court's phrase "no sound reasoning process" is a better term.

## VII. JUSTICE REQUIRES A NEW TRIAL

■ We conclude that the cumulative effect of the trial court's decision not to allow the testimony of Dr. Fulero, when the evidence against Echols consisted of eyewitness identification, and its decision to allow Echols to be tried on all charges in one trial, so that the jury heard the eyewitness testimony of six witnesses, deprived Echols of his Fourteenth Amendment due process rights to a fair trial. Error in the admission of evidence is harmless if "there is no reasonable possibility that the evidence may have contributed to the accused's conviction, and * * * in such cases there must be overwhelming evidence of the accused's guilt or some other indicia that the error did not contribute to the conviction."[35] Under the facts of this case, where the evidence of guilt for each incident was not overwhelming, we cannot say that there is no reasonable possibility that the trial court's errors contributed to Echols's convictions. Therefore, we sustain Echols's first two assignments.

---

33. *State v. Chapple*, 135 Ariz. at 297, 660 P.2d at 1224, fn. 18.

34. *See AAAA Ent., Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597, 601.

35. *State v. DeMarco* (1987), 31 Ohio St.3d 191, 195, 31 OBR 390, 393, 509 N.E.2d 1256, 1260.

## VIII. NO SIXTH AMENDMENT RIGHT TO
## COUNSEL AT ECHOLS'S LINE–UP

The disposition of the first two assignments of error, however, does not end our discussion. Some of Echols's remaining assignments of error must be addressed even though we have already established grounds for the reversal of the trial court's judgment. Echols raises four assignments of error involving the pretrial line-up identification. The gist of assignments of error five, six, seven, and eight is that, because the pretrial line-up was conducted without counsel, Echols's Sixth Amendment rights were violated, therefore making testimony concerning his line-up identification inadmissible. Echols also assigns as error ineffective assistance of counsel because counsel did not object to testimony about either the line-up identification or the in-court identification.

The Sixth Amendment right to counsel at the time of a line-up attaches " 'only when adversarial proceedings are initiated against an individual for a particular incident by way of indictment, information, arraignment, or preliminary hearing.' * * * The right does not extend to a line-up after arrest, but before any of the listed formal proceedings."[36] The right is "offense specific."[37] In this case, five witnesses viewed Echols in a line-up conducted after his arrest for the May 5, 1996 incident, but prior to his indictment on any of the charges. Though it is unclear from the record before us, it is possible that Echols had been formally charged by way of a criminal complaint for the futon store robbery. We cannot tell whether he had been arraigned on that offense, as no municipal court records are among those certified to us. But even if he had been formally charged with the futon store offense, no witness to that offense was involved in the line-up identification—only witnesses to the earlier offenses were involved. We conclude that, under the facts of this case, Echols's Sixth Amendment right to counsel had not attached for the offenses related to the witnesses' viewing of the line-up, because no charges were pending for those offenses.

At this point, it is important to clarify the pertinent difference between Sixth Amendment and Fifth Amendment rights to counsel. The Sixth Amendment right to counsel is premised on the guarantee of the accused to have counsel *for his defense*. This right to counsel does not attach *until* a prosecution is commenced.[38] The purpose of the Sixth Amendment right to counsel is to

**36.** *State v. Mills* (1992), 62 Ohio St.3d 357, 370, 582 N.E.2d 972, 984–985, certiorari denied (1992), 505 U.S. 1227, 112 S.Ct. 3048, 120 L.Ed.2d 915, quoting *State v. Broom* (1988), 40 Ohio St.3d 277, 293–294, 533 N.E.2d 682, 700.

**37.** *McNeil v. Wisconsin* (1991), 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158; *State v. Chandler* (Mar. 15, 1995), Hamilton App. No. C–940166, unreported, 1995 WL 109056.

**38.** *McNeil v. Wisconsin* at 176, 111 S.Ct. at 2207, 115 L.Ed.2d at 167.

provide an unaided layperson protection against the government, an "expert adversary," once adverse positions have solidified as to a particular crime.[39] This right cannot be invoked for future prosecutions because it does not attach until the adversarial proceedings have commenced.[40]

The Fifth Amendment right to counsel is based on the guarantee that one cannot be forced to be a witness against oneself. This right to counsel is "designed to counteract the 'inherently compelling pressures' of custodial interrogation."[41] Its purpose is to protect "the suspect's 'desire to deal with the police only through counsel.'"[42] This right relates to any custodial interrogation regarding a suspected crime and attaches regardless of whether a prosecution has commenced.[43]

Because the line-up did not violate Echols's Sixth Amendment right to counsel, his claims of error regarding the admission of testimony concerning the line-up identification, the admission of the in-court identification of Echols based on the pretrial line-up identification, and his claim of ineffective assistance of counsel concerning the failure to object to the admission of the identification testimony must also fail. Accordingly, we overrule Echols's fifth, sixth, seventh, and eighth assignments of error.

## IX. SHOW–UP WAS NOT UNFAIRLY SUGGESTIVE

In his ninth and tenth assignments of error, Echols claims that the trial court erred by admitting the in-court identification of the woman at the futon store, because the one-on-one show-up from the back of the police cruiser was unfairly suggestive, and that he had ineffective assistance of counsel because his counsel did not object to the in-court identification.

The police showed the woman a photograph array containing a photograph of Echols. She identified Echols as the man who pulled the knife on her. Later that day, she viewed Echols in the back of the police cruiser and identified him again as the man with the knife. Subsequently, the woman identified Echols at trial as the same man.

---

39. *Id.* at 178–179, 111 S.Ct. at 2209, 115 L.Ed.2d at 168–169.

40. *Id.* at 176, 111 S.Ct. at 2207, 115 L.Ed.2d at 167.

41. *Id.* at 176, 111 S.Ct. at 2208, 115 L.Ed.2d at 167.

42. *Id.* at 178, 111 S.Ct. at 2209, 115 L.Ed.2d at 168, quoting *Edwards v. Arizona* (1981), 451 U.S. 477, 484, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386.

43. *Id.*

■ While we do not condone the viewing by a witness of a suspect while he sits in the back of a police cruiser, under the facts of this case, where the view of Echols in the cruiser was the second identification, we cannot conclude that it was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."[44] The witness provided the police with a description of a man with a knife. She identified Echols as that man from an unchallenged photograph array. She viewed two other men brought to her by the police just before she viewed Echols. "Where a witness has already identified a suspect in circumstances which are not 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification,' a subsequent identification procedure which may be 'impermissibly suggestive' does not taint the original identification."[45] Further, even if the procedure contained notable flaws, the record demonstrates that the woman's in-court identification was still admissible under the factors set out in *Neil v. Biggers*.[46] Therefore, Echols's ninth and tenth assignments of error are overruled.

## X. WITNESS'S REACTION DID NOT TAINT LINE–UP

■ In his twelfth and thirteenth assignments of error, Echols challenges the trial court's admission of the victims' pretrial and in-court identification of Echols based on the dry-cleaning clerk's reaction during the line-up procedure. The victims involved in the line-up procedure simultaneously viewed the suspects. They were not allowed to speak during the procedure and afterwards were interviewed separately. All identified Echols as their assailant. The clerk from the dry-cleaning business testified that when she viewed Echols in the line-up, she began shaking, started breathing heavily, and put her head between her legs. None of the victims testified that the reaction influenced their determination. One victim testified that he heard "people" gasp when either the witnesses or the suspects entered the room. The record is unclear as to when Police Officer Ficker, who was standing close to the woman, noted that the woman began to cry during the line-up. Three of the victims testified that they were given no assistance in their determination by anyone. We cannot conclude from the record before us that the clerk's reaction made the line-up "so impermissibly

---

44. See *Simmons v. United States* (1968), 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253; *State v. Barker* (1978), 53 Ohio St.2d 135, 7 O.O.3d 213, 372 N.E.2d 1324, certiorari denied (1978), 439 U.S. 913, 99 S.Ct. 285, 58 L.Ed.2d 260.

45. *State v. Kaiser* (1978), 56 Ohio St.2d 29, 10 O.O.3d 75, 381 N.E.2d 633, paragraph one of the syllabus, quoting *Simmons v. United States, supra,* note 44.

46. *Neil v. Biggers* (1972), 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411.

suggestive as to give rise to a very substantial likelihood of irreparable misidentification." [47] We overrule Echols's twelfth and thirteenth assignments of error.

## XI. FAILURE TO RULE ON MOTION TO SUPPRESS DID NOT CONSTITUTE PLAIN ERROR

In his fifteenth and sixteenth assignments of error, Echols argues that the trial court erred by failing to rule on his motion to suppress his in-court identification, and that he received ineffective assistance of counsel because his counsel failed to pursue a determination of the motion. The record reveals that the trial court did not rule on Echols's motion to suppress, in which he claimed photographs and/or "other prejudicial pretrial identification methods" were used with witnesses. Crim.R. 12(E) mandates that a motion to suppress illegally obtained identification testimony be determined before trial. The trial court did not decide Echols's motion to suppress, nor does the record demonstrate any objection to its failure to do so. Therefore, Echols's counsel decided either for tactical reasons or by oversight not to press the issue, thus waiving any error by the trial court unless the error constitutes plain error.[48] Plain error results when the record demonstrates that an error occurred and that, except for that error, the outcome of the trial would have been different.[49] In this case, the trial court erred. But in light of our prior discussion of Echols's assignments of error concerning pretrial identification procedures, we cannot say that, except for that error, the outcome of the trial would have been different.[50] In passing, we note that the police officers showed only one of the victims a photograph array containing a picture of Echols. That array was not made part of the record. Further, under the facts of this case, we cannot conclude that the failure of counsel to ensure a determination on the motion to suppress prejudiced Echols.[51]

## XII. CRIM.R. 29 MOTION PROPERLY DENIED

In his eleventh assignment of error, Echols contends that the trial court erred by denying his Crim.R. 29 motion for acquittal on the robbery and aggravated

47. *State v. Sheardon* (1972), 31 Ohio St.2d 20, 60 O.O.2d 11, 285 N.E.2d 335, paragraph two of the syllabus; *Simmons v. United States*, 390 U.S. at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253.

48. See *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332; *State v. Fields* (1994), 97 Ohio App.3d 337, 344, 646 N.E.2d 866, 870–871.

49. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, certiorari denied *sub nom. Long v. McKeen* (1984), 465 U.S. 1106, 104 S.Ct. 1608, 80 L.Ed.2d 138.

50. *Id.*

51. See *State v. Bradley* (1989), 42 Ohio St.3d 136, 143, 538 N.E.2d 373, 380, certiorari denied (1990), 497 U.S. 1011, 110 S.Ct. 3258, 111 L.Ed.2d 768.

robbery charges involving the futon store. At trial, the victim testified that a man she later identified as Echols entered the futon store and discussed buying some pillows. He returned later that afternoon and said he wanted the pillows they had discussed previously. She began writing an invoice and asked the man how he wanted to pay for the pillows. The man took nothing and demanded nothing. He pulled a knife and said, "Be cool, Baby." She began screaming and the man left. Officer Condo testified that the robbery charges were based upon his interview with the victim and her statement that when she asked the man how he was going to pay for the pillows, the man produced a knife and stated, "This is how I'm going to pay for it, don't do anything, be cool." Echols made no objection to the testimony and, on cross-examination, questioned the officer about his statement. Echols also submitted a police report stating that the victim asked the robber how he was going to pay and that he showed her a knife.

 A Crim.R. 29 motion should not be granted "if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt."[52] In ruling on a motion for acquittal, the trial court must view the evidence in a light most favorable to the state.[53]

 Robbery, in this instance, requires proof of an attempt or commission of a theft or flight immediately after the attempt or commission, with a deadly weapon on or about the offender or under the offender's control.[54] Aggravated robbery requires proof of the same elements, except the offender must also "display the weapon, brandish it, indicate that the offender possesses it, or use it."[55] At issue in this case is whether there was such a lack of evidence of theft or attempted theft to require acquittal. We agree with Echols that the testimony of the victim standing alone was insufficient for reasonable minds to reach different conclusions as to whether an attempted theft had occurred. Further, the police officer's testimony was inadmissible hearsay that did not fall within any of the exceptions enumerated by the Ohio Rules of Evidence. Echols, however, did not object to the testimony. Therefore, he waived the error unless it constitutes plain error.[56] We cannot say under these facts, especially where Echols placed

**52.** *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus.

**53.** *State v. Evans* (1992), 63 Ohio St.3d 231, 248, 586 N.E.2d 1042, 1056, certiorari denied (1992), 506 U.S. 886, 113 S.Ct. 246, 121 L.Ed.2d 179.

**54.** R.C. 2911.02(A)(1).

**55.** R.C. 2911.01(A)(1).

**56.** See *State v. Underwood, supra.*

an exhibit containing the statement into evidence independently from the testimony, that there is plain error. We overrule Echols's eleventh assignment of error.

## XIII. EVIDENCE PRESENTED SUFFICIENT TO SUSTAIN CONVICTIONS

Echols claims, in part, in his fourteenth assignment of error that his convictions were unsupported by sufficient evidence. We have already set forth the elements of robbery and aggravated robbery. Kidnapping is defined in R.C. 2905.01(A)(2) as the removal of a victim by threat or force from the place where the victim is found or the restraint of a victim's liberty to facilitate the commission of a felony. In reviewing a sufficiency-of-the-evidence issue, a reviewing court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."[57] We have set out the evidence adduced at trial in the beginning of this decision and see no reason to repeat it here. Reviewing that evidence as presented to the jury, including the other-acts evidence, and keeping in mind that the weight and credibility of the evidence are to be left to the trier of fact, we believe that Echols's convictions were supported by sufficient evidence.[58]

## XIV. ECHOLS'S CONVICTIONS ARE REVERSED

The remaining assignments of error, which raise sentencing errors (assignments of error three and seventeen), ineffective assistance of counsel for failure to seek a jury instruction and to object to the imposition of a sentence (assignment of error four), and issues of weight (part of assignment of error fourteen), need not be addressed in light of our disposition of Echols's first two assignments of error.

For the reasons set forth above, we reverse the trial court's judgment and remand this cause to the trial court for a new trial consistent with this decision and the law.

*Judgment reversed*
*and cause remanded.*

---

57. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

58. See *State v. Schaim; State v. DeMarco;* and *State v. Van Sickle, supra.*

MARIANNA BROWN BETTMAN, J., concurs separately.

GORMAN, P.J., dissents.

MARIANNA BROWN BETTMAN, Judge, concurring separately.

While I concur in Judge Painter's opinion and in the judgment, my views on joinder in this case lie somewhere between that of my two colleagues.

In both *State v. Lott*[59] and again in *State v. Mills*,[60] the Ohio Supreme Court held, although not in the syllabus, that the state could use either the "other acts" test or the "simple and distinct" test to defeat a defense claim of prejudicial joinder. My problem in this case is that when all the claims and all the counts are combined, I do not think that the argument that joinder is prejudicial can be overcome. However, I am equally convinced that under either the "simple and distinct" test or the admittedly stricter "other-acts" test, some combination of these claims and counts can be tried together. This is what must be sorted out on remand. The decision as to which of the counts can properly be joined will depend on the analysis used.

GORMAN, Presiding Judge, dissenting.

Any neutral analysis of joinder should first begin with the recognition that joinder of similar offenses in the indictment is the rule, not the exception. Crim.R. 8(A) provides that multiple offenses may be charged in the same indictment provided that they are "of the same or similar character." When multiple offenses meet this requirement, the law favors joining them in a single trial.[61] The reason joinder is favored is not because the state is cheap and willing to sacrifice justice, as the majority suggests, but because it conserves judicial resources, lessens the chance of inconsistent results in successive trials, and diminishes inconvenience to the witnesses.[62]

The evidence is undisputed that the six robberies in this case were committed over a thirty-day period by a lone man operating within a two-block area, ordering his victims at knifepoint to hand over money, without any other

---

**59.** (1990), 51 Ohio St.3d 160, 555 N.E.2d 293, certiorari denied (1990), 498 U.S. 1017, 111 S.Ct. 591, 112 L.Ed.2d 596.

**60.** (1992), 62 Ohio St.3d 357, 582 N.E.2d 972, certiorari denied (1992), 505 U.S. 1227, 112 S.Ct. 3048, 120 L.Ed.2d 915.

**61.** *State v. Wiles* (1991), 59 Ohio St.3d 71, 76, 571 N.E.2d 97, 108; *State v. Lott* (1990), 51 Ohio St.3d 160, 163, 555 N.E.2d 293, 298; *State v. Torres* (1981), 66 Ohio St.2d 340, 343, 20 O.O.3d 313, 314–315, 421 N.E.2d 1288, 1290.

**62.** *State v. Schaim* (1992), 65 Ohio St.3d 51, 58, 600 N.E.2d 661, 667.

apparent motive besides robbery. The majority attempts to distinguish each robbery based upon such things as the description of the knife, the degree to which the perpetrator hid his face, or the precise words that he used to threaten the victim. For purposes of Crim.R. 8(A), however, the inquiry is only whether the offenses are similar in character, not identical in execution.

Under Crim.R. 14, Echols was required to establish prejudice in order to require that each of the robberies be tried separately. As the majority correctly observes, his claim of prejudice is defeated when either the "other acts" or the "simple and distinct" test is met. The majority's analysis unravels, however, when it in effect places the burden on the state to demonstrate that either of these tests is satisfied. Both at trial and on appeal, the burdens of both production and persuasion remain on the defendant to "affirmatively show prejudice." [63]

I strongly disagree with the majority's conclusion that Echols has affirmatively established prejudice under either the "other acts" or the "simple and distinct" test. Under the "simple and distinct" test, the only question is whether the jury can segregate the evidence of each crime. There are, concededly, many cases in which this might not be possible, as, for example, in *Schaim*, in which the defendant was accused of subjecting the same two victims (his daughter and adopted daughter) to a pattern of sexual abuse. Multiple RICO charges would be another example, or any multicount indictment that involves crimes the evidence of which is overlapping. That is not the case, here, however, where each robbery was a completely separate act. Of course, the mere fact that all the crimes were robberies does not violate the "simple and distinct" test, since the offenses must be of the "same or similar character" even to qualify for joinder under Crim.R. 8(A). Beyond the similarities already discussed, however, there was nothing interlocking, interwoven, interconnected, or interrelated about the robberies themselves: each involved different victims, different factual scenarios, and different witnesses. The facts concerning each robbery were not even remotely complex: although undoubtedly terrifying to their victims, the robberies were simple holdups, nothing more.

To suggest, therefore, that the jurors lacked the mental capacity to segregate the evidence with respect to each charge is to deny them even average intelligence. Although it is not mentioned by the majority, the trial court allowed the jurors to take notes because of the number of charges. The record reflects that, on the morning of the trial, members of the jury arrived with notebooks. Furthermore, the trial court gave the standard charge from the Ohio Jury Instructions for the jury to consider the evidence of each robbery separately. It

---

**63.** *Wiles, supra,* at 76, 571 N.E.2d at 108; *Schaim, supra,* at 59, 600 N.E.2d at 668.

is a well-settled principle of appellate review that the jury is presumed to have followed these instructions.[64]

In sum, there is absolutely no evidence of jury confusion in this case and no reason to infer it. In holding that the "simple and distinct" test has not been satisfied, the majority concludes that *"it is not improbable"* that the jury became confused and cumulated the evidence. (Emphasis supplied.) The burden on Echols, however, is to affirmatively establish prejudice, not merely to demonstrate its theoretical possibility.

Because the "simple and distinct" test is so palpably satisfied upon this record, the "other acts" test need not even be reached. The burden was on Echols to demonstrate that neither test was satisfied. It is sufficient to note that all the robberies shared enough common characteristics to be probative on the issue of identity and would, therefore, have been admissible under Evid.R. 404(B) if the robberies had been tried separately.[65] Ironically, in discussing the "other acts" test, the majority relies in part upon this court's decision in *State v. Knight* (June 5, 1998), Hamilton App. No. C–970563, unreported, 1998 WL 299314, in which the court criticized the defendant's analysis by stating that it "miss[ed] the point entirely when it tries to point out dissimilarities in details of the other acts." This is exactly, however, the analysis adopted by the majority today.[66]

By presuming prejudice rather than requiring the defendant to demonstrate it, the majority's decision stands the law of joinder on its head, turning it into the exception rather than the rule. Other than to require separate trials, the majority provides no guidance for trial courts confronted with the issue. The majority's analysis cannot be reconciled with our previous discussion of joinder in *State v. Decker*,[67] unless the dissent in that decision is now to be taken as the law. If so, we have eviscerated Crim.R. 8(A) and turned our back on an entire body of legal precedent favoring joinder.

Finally, I also disagree with the majority's conclusion that the exclusion of Echols's expert testimony on eyewitness identification amounted to cumulative error sufficient to support reversal. Evidentiary rulings with respect to the admission or exclusion of expert testimony will ordinarily not be reversed absent

---

64. *State v. Garner* (1995), 74 Ohio St.3d 49, 656 N.E.2d 623.

65. *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682; *State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180.

66. My reference to *State v. Knight* should not be construed as an endorsement of its holding, which assumes without analysis that identity or motive was put at issue by the facts of that case.

67. (1993), 88 Ohio App.3d 544, 624 N.E.2d 350.

a clear showing that the trial court abused its discretion.[68] Despite the fact that the trial court gave erroneous reasons for excluding the testimony, the record creates considerable doubt whether Dr. Fulero's testimony would have assisted the jury without invading its province to determine witness credibility.[69] Additionally, the trial court retains discretionary authority to exclude even relevant evidence if that evidence would waste time or confuse the issues at trial. Evid.R. 403(B). Given the opportunities during cross-examination and closing argument to alert the jury to any inconsistencies or extraneous factors affecting perception and memory, I would hold that the jury was given ample information to evaluate the testimony of the robbery victims in this case.

For all these reasons, I disagree strongly with the majority's conclusion that "justice requires a new trial" in this case. Justice requires that we treat jury verdicts with more respect. I would affirm.

---

68. *State v. Tomlin* (1992), 63 Ohio St.3d 724, 727–728, 590 N.E.2d 1253, 1256.

69. *State v. Buell* (1986), 22 Ohio St.3d 124, 133, 22 OBR 203, 210–211, 489 N.E.2d 795, 804.