DECISION.
{¶ 1} The defendant-appellant, Devail Bennie, appeals from his conviction on three counts of burglary in violation of R.C.2911.12(A)(2). Bennie was originally indicted on five counts of burglary, which were tried together before a jury. Although the jury found him guilty on the second, third, and fifth counts, it acquitted him on the fourth count and could not reach a verdict on the first count. In his three assignments of error, Bennie now argues that (1) the trial court erred by failing to grant his motion for severance under Crim.R. 14, (2) his convictions were contrary to the manifest weight of the evidence, and (3) he was denied the effective assistance of counsel. For the following reasons, we affirm.
 THE COUNTS {¶ 2} Although Bennie was convicted of only counts two, three, and five, we summarize all five counts since one of the issues raised is the trial court's failure to grant a severance. As do the parties in their briefs, we summarize the counts in chronological rather than numerical order.
Count One (Hung Jury)
 {¶ 3} In count I of the indictment, Bennie was charged with burglarizing Jason Brown's apartment in the Cincinnati neighborhood of Clifton. The alleged burglary took place on the morning of September 19, 2001, when Brown, who was lying in bed, heard a noise at the window, saw gloved hands attempting to open the window screen, and then watched as an uninvited head pushed its way into the bedroom. The head was that of an unfamiliar African-American male. Brown reacted by getting out of bed and punching the intruder in the face, at which point the intruder fell backward and ran away.
 {¶ 4} Because of his quick reaction, Brown admitted that he had viewed the face only briefly. But he described the intruder to his girlfriend, based upon his glimpse of the face and his view of the figure running, as a 25-35-year-old African-American, standing about six feet tall, with a short haircut and a receding hairline. At the second of two photographic lineups arranged by the police after receiving information that Bennie may have been involved in the break-ins, Brown identified the intruder as Bennie.
 {¶ 5} On the same morning, Paul Ganin, Brown's neighbor, noticed a tee shirt stuck between his garbage cans. On closer inspection, he found that the tee shirt contained socks stuffed with approximately one hundred pennies. He took the tee shirt inside the house with him. Later that afternoon, a man, whom he subsequently identified from a photographic lineup as Bennie, approached him outside his home, asking him if he had found any pennies. Bennie testified that he felt uneasy in the man's presence and gave him the pennies with a warning not to trespass on his property again.
Count Three (Conviction)
 {¶ 6} On September 23, 2001, four days after the Brown burglary, Daniel Phenicie was watching television with his girlfriend at his house in Clifton when both of them heard a noise emanating from the attached garage. Investigating, Phenicie's girlfriend spotted a man leaving the garage with a box. As she called the police, Phenicie enlisted the help of a neighbor, David Kohake, who had shortly before noticed a man suspiciously wearing gloves and carrying a box. They caught up to the man as he was climbing a fence. In the ensuing confrontation, the man handed the box back to Phenicie while blaming the crime on "the kid that hit the place a few weeks ago." The man was able to flee over the fence. Upon inspection, Phenicie discovered that the box contained items taken from one of the cars in his garage.
 {¶ 7} Phenicie described the man as six feet tall, weighing one hundred and fifty to one hundred and sixty pounds, and bald. He later identified Bennie from a photographic lineup, although he testified that Bennie was the only bald person in the array. Kohake also identified Bennie from a photographic lineup after narrowing the choices down to two possibilities.
Count Two (Conviction)
 {¶ 8} The very next day, on September 24, Ganin, Brown's neighbor, came home for lunch and again found strange items near his garbage cans, including a new kitchen garbage can, two backpacks, and several laundry baskets. He quickly deduced that someone was being burglarized and took the containers inside his house, where he discovered that they contained a DVD player, camera equipment, diamond earrings, and other items. He then called the police. After doing so, he looked out his side door and spotted the same man with whom he had previously spoken about the tee shirt and pennies, and whom he eventually identified as Bennie, leaving Brown's apartment. The man was carrying a duffle bag and what appeared to Ganin to be an answering machine.
 {¶ 9} When the man came once again on his property, Ganin confronted him. The man cursed at Ganin and then fled. Brown later discovered that his apartment had been burglarized and that numerous items had been taken, including those recovered by Ganin from around his trashcans.
Count Four (Acquittal)
 {¶ 10} Approximately two weeks later, another Clifton resident, Donald Uhlinger, was parking cars for a University of Cincinnati football game when he happened to pass by his house and noticed a strange man walking along a private walkway crossing his property. He confronted the man, telling him to stay off his property, and then proceeded up the driveway to the entrance of his house. There he discovered boxes at the base of the steps containing items that belonged to him and had been taken from inside. Reacting quickly, he chased after and caught up to the man with whom he had just spoken. The man denied involvement in the burglary and instead told Uhlinger that the person emptying his home of possessions lived up the street. Uhlinger then used his cellular phone to dial 911 and was describing the man standing with him to the police when the man suddenly took off running. Uhlinger gave chase until he realized that the man could be armed and turn upon him.
 {¶ 11} Uhlinger, who described the man's hair as extremely short, later positively identified Bennie from a photographic lineup.
Count Five (Conviction)
 {¶ 12} A week later, on October 13, 2003, Jeff Chen was at his home in Clifton during the early morning hours when he heard a noise inside the house but assumed it was caused by one or all of his three roommates. The next morning, however, he realized that the house had been broken into and that several items had gone missing, including a suitcase, a garment bag with suits, a laptop-computer carrying case, tools, and food from the refrigerator. Police investigating the case dusted for footprints because it had been raining the night of the break-in. They recovered a print of a gym shoe and another of a boot.
 {¶ 13} The police would later connect the print of the gym shoe to a gym shoe found in Bennie's possession after his arrest. Before that, however, they connected the boot print to Shawn Odoms, who had been arrested for burglarizing a home in the nearby neighborhood of Mt. Auburn. When asked about the Chen robbery, Odoms confessed that he and Bennie had been involved in the break-in.
 BENNIE'S ARREST {¶ 14} Odoms gave police information that they could find Bennie and many of the stolen items in a garage behind a private Clifton residence located near the burglarized homes. The homeowner had been tacitly allowing Bennie to stay in her garage after he had refused to leave. The homeowner gave police permission to search the garage, and when they did they discovered Bennie, who was placed under arrest. At the same time, police recovered from the garage multiple pairs of gloves and a cassette used in an answering machine that belonged to Jason Brown.
 {¶ 15} Questioned later, Bennie, according to the testimony of one of the police officers, admitted to being involved with Odoms in the Chen burglary. He would not admit to any involvement in the other burglaries, however, and deflected their inquiries by stating that Odoms was "their man." He did not assist the police in the recovery of any stolen goods. The police were able, however, to recover some of the items taken from Chen's home from one of Odoms's relatives.
 SEVERANCE {¶ 16} In his first assignment of error, Bennie argues that the trial court erred by denying his motion to sever the five burglary counts. He argues that joinder of all five counts prejudiced his case before the jury by implicating him in several burglaries and allowing the jury to consider evidence that would have been inadmissible in separate trials. We disagree.
 {¶ 17} Joinder of similar offenses is generally the rule, not the exception. Crim.R. 8(A) specifically provides that "offenses of the same or similar character" may be charged in the same indictment. Offenses may also be joined if they are "based on two or more transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Joinder of such offenses is favored for the purpose of conserving judicial resources, lessening the chance of inconsistent results, and diminishing the inconvenience to witnesses. State v. Wiles (1991), 59 Ohio St.3d 71, 76,571 N.E.2d 97.
 {¶ 18} Undoubtedly all five counts against Bennie were similar in nature — all involved brazen, slapdash, almost bumbling burglaries (cat burglaries these were not). All the burglaries occurred in the same neighborhood within a relatively short period of time. As has been noted before, the joined offenses need only be similar in nature, "not identical in execution." State v. Echols (1998), 128 Ohio App.3d 677, 708,716 N.E.2d 728 (Gorman, J., dissenting) ("Echols I"). The burglaries here certainly were part of a course of criminal conduct.
 {¶ 19} Crim.R. 14 provides that a trial court may grant severance or other relief to the defendant (or the state) if joinder creates prejudice. From a defense perspective, joinder is often perceived as inherently prejudicial since the jury is given evidence linking the accused not to one, but to two or more crimes. It is a natural human tendency to more readily accept the guilt of a person linked to several crimes as opposed to one. But more than just the cumulation of charges is required to establish prejudice. Rather, the defendant must affirmatively show that his right to a fair trial will be violated by joinder. State v.Schaim (1992), 65 Ohio St.3d 51, 59, 600 N.E.2d 661.
 {¶ 20} Conversely, the state can defeat a claim of prejudice by showing either (1) that the evidence for each count will be admissible in a trial of the other counts under Evid.R. 404(B), or (2) that the evidence for each count is sufficiently separate and distinct so as not to lead the jury into treating it as evidence of another. Echols, supra, at 692, 716 N.E.2d 728.
 {¶ 21} Consistent with federal practice, this court has held that a defendant who has moved for severance before trial must renew the motion at the close of the evidence in order to preserve the issue for appeal. See State v. Echols (2001),146 Ohio App.3d 81, 88, 765 N.E.2d 379 ("Echols II"). Where a defendant does not renew the motion at the conclusion of the trial, it is assumed that the defendant has become satisfied with the course of events and is now willing to have the joined counts submitted to the jury. In such case, we review the matter only for plain error. Id. Plain error is found only in the exceptional case where the error has determined the outcome and resulted in a miscarriage of justice. State v. Underwood (1983),3 Ohio St.3d 12, 444 N.E.2d 1332, syllabus; State v. Long (1978),53 Ohio St.2d 91, 372 N.E.2d 804, paragraph two of the syllabus.
 {¶ 22} Although neither party has addressed the procedural issue, our review of the record does not disclose that Bennie renewed his severance motion after the case was tried but before it was submitted to the jury. Thus, we review the issue for plain error. Even if we assume that the motion was renewed and the issue thus preserved, the decision whether to sever is normally reviewed under a liberal abuse-of-discretion standard. SeeEchols I, supra, at 696, 716 N.E.2d 728.
 {¶ 23} We hold that the joinder of all five counts did not constitute plain error or, alternatively, that it was not an abuse of the trial court's discretion. Bennie's claims of prejudice are significantly undermined by the jury verdicts in this case, which acquitted him on the fourth count and left the first count undecided. Indeed, the fact that the jury was unable to reach a decision whether Bennie was guilty of burglarizing Brown in the first count, and yet found him guilty of burglarizing him in the second count (after Bennie was identified in both burglaries), indicates very strongly that the jury independently weighed the evidence on each count. Likewise, the fact that the jury acquitted Bennie of the fourth count — clearly the state's weakest, since it did not involve any evidence placing Bennie inside Uhlinger's house — also buttresses the conclusion that the jury decided each count on its merits. For the three counts that the jury did find Bennie guilty, the evidence was largely overwhelming — indeed, Bennie was either caught in the act or admitted to his involvement (as in the Chen burglary) — and it is difficult if not impossible to articulate a convincing argument that joinder determined the outcome. If each of the three counts resulting in conviction had been tried separately, we are convinced that the same results should have been expected.
 {¶ 24} As regards the "other acts" and "simple and distinct" tests — either of which, as noted, can be used to defeat a claim of prejudice — we hold that both were satisfied here. Identity was clearly an issue in this case, not simply because Bennie pleaded not guilty, see State v. Griffin (2001),142 Ohio App.3d 65, 73, 753 N.E.2d 967, but because his defense was that he had been misidentified as the perpetrator. "Identity is an issue when the fact of the crime is open and evident but the perpetrator is unknown and the accused denies that he committed it. In that event, other act evidence tends to show the defendant's identity as the perpetrator by showing that he committed crimes of a similar methodology within a period of time reasonably near to the offense on trial, which itself would constitute probative evidence of the probability that the same person, whoever he or she may be, committed both crimes." Statev. Smith (1992), 84 Ohio App.3d 647, 666-667, 617 N.E.2d 1160.
 {¶ 25} Bennie argues that the burglaries were not sufficiently similar in terms of methodology to create a "behaviorist fingerprint" linking him to each crime. This argument ignores the fact, however, that he was linked to each crime by means equally if not more probative than similar methodology: eyewitness identification and self-admission (as in the Chen burglary). Furthermore, although all the burglaries may not have been distinctly alike sufficient to constitute a modus operandi — if anything, the burglaries were alike in their amateurishness — they still constituted a course of criminal conduct given their temporal and geographical proximity.
 {¶ 26} Finally, we hold that the counts satisfied the "simple and distinct" test in that we perceive no obstacle to the jury treating the evidence of each independently. As discussed previously, the proof of this is in the verdicts reached — convictions on the three strongest counts against Bennie, and an acquittal and a hung jury on the weakest. These results aside, we do not consider the evidence of each count difficult to segregate, or so inherently bound together that the jury could not have easily kept it apart. Juries are often expected to parse through far more difficult, complex, and nuanced bodies of evidence than this.
 {¶ 27} Bennie's first assignment of error is overruled.
 WEIGHT OF THE EVIDENCE {¶ 28} In his second assignment of error, Bennie argues that his convictions were contrary to the manifest weight of the evidence. In this regard, he points to the fact that certain photographic lineups did not yield positive identifications, and that in any case an expert retained by the defense testified to the unreliability of eyewitness testimony.
 {¶ 29} When considering the merits of a weight-of-the-evidence challenge, an appellate courts sits as a "thirteenth juror" and reweighs the evidence not to reach its own verdict, but to determine whether the jury in reaching its verdict "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Martin (1983), 20 Ohio App.3d 172,175, 485 N.E.2d 717. Reversal on this basis is reserved strictly for the exceptional case and is not based on any mathematical formula (as if such were possible), but upon the effect of the evidence to induce belief. See State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541.
 {¶ 30} Having review the record, we do not find this to be the exceptional case. Although there may have been uncertainty with respect to some of the earlier photographic arrays, these were occasioned in part due to out-of-date photographs. It should be noted that many of the eyewitnesses spoke to Bennie at length and thus were given ample opportunity to commit his features to memory. This is not a case of brief, fleeting glimpses under inordinate stress. Thus, although the expert's testimony was relevant, the jury could have rationally chosen to believe that the eyewitnesses correctly identified Bennie. As far as the Chen burglary, the similarity of the tread on the print of the gym shoe and the gym shoe found in Bennie's garage, Odom's statements about Bennie's involvement, and Bennie's own statements to the police are sufficient to convince us, sitting as a thirteenth juror, that the other twelve did not lose their way or commit a manifest miscarriage of justice.
 {¶ 31} Bennie's second assignment of error is overruled.
 INEFFECTIVE ASSISTANCE OF COUNSEL {¶ 32} Responding to a letter request from Bennie, his appellate attorney asks that we review the record for any violation of Bennie's Sixth Amendment right to effective assistance of counsel. According to counsel, Bennie has advanced the claim in his letter that his trial attorney failed to secure the testimony of witnesses who would have materially aided his defense. These witnesses are not identified, however, and the claim, if it has any substance, would be more appropriate for postconviction relief aided by evidence outside the record.
 {¶ 33} Bennie's third assignment of error is overruled.
 {¶ 34} The judgment of the trial court is affirmed.
Judgment affirmed.
Winkler, P.J., and Doan, J., concur.