DECISION
{¶ 1} Defendant-appellant Willie J. Harris was charged with four counts of aggravated robbery and five counts of robbery stemming from his involvement in four separate armed robberies. All the aggravated-robbery counts included both one-year and three-year gun specifications. Following a jury trial, Harris was convicted of all nine counts and the accompanying gun specifications. The trial court sentenced Harris to a total of fifty-two years in prison. Harris now appeals his convictions and sentence, raising six assignments of error for our review. Because we find merit in Harris's sixth assignment of error, we vacate Harris's sentence and remand this cause for resentencing.
 I. Facts and Procedural History {¶ 2} On December 30, 2003, a Hamilton County grand jury indicted Harris on four counts of aggravated robbery and five counts of robbery. The aggravated-robbery charge in count one and the robbery charge in count two concerned a theft at the Marathon gas station on Mitchell Avenue. The aggravated-robbery charge contained in count three and the robbery charges in counts four and five concerned a theft at the United Dairy Farmers ("UDF") in Norwood. The aggravated-robbery and robbery charges in counts six and seven concerned a theft at the UDF in St. Bernard. The aggravated-robbery charge in count eight and the robbery charge in count nine concerned a theft at the Walgreens store on Mitchell Avenue. Each of the aggravated-robbery counts were accompanied by a one-year and a three-year gun specification. Harris pleaded not guilty.
 {¶ 3} Prior to trial, Harris filed a motion to suppress all the pretrial witness identifications, as well as his statement to police. The trial court denied the motion after a hearing. Harris also filed a motion for a separate trial on each of the aggravated-robbery charges, which the trial court denied. The following is a summary of the evidence presented during Harris's trial with respect to each of the charges.
Marathon Robbery
 {¶ 4} Around 10:30 p.m. on October 15, 2003, Della Cliff was working at the Marathon Station on Mitchell Avenue when a young African-American man wearing a black ski mask, a camel brown jacket, and gloves entered the store and pulled out a silver gun. The man told Cliff that he was robbing the store. Cliff heard a gun click followed by the man's statement that she was going to die. The man then told Cliff to step behind the counter and open the cash-register drawer. When Cliff opened the register, the man grabbed the money and left the store. Cliff called the police. Seconds later, an Asian woman, later identified as Yim Ng, came into the store to pay for some gasoline. Several minutes later, Cliff saw a car speeding through the parking lot. The masked gunman took approximately $235. Although police showed Cliff some photo arrays, she was unable to identify the gunman.
 {¶ 5} Yim Ng was buying some gasoline at the Marathon station when she saw an African-American man wearing a ski mask and camel jacket leave the store. Before the police arrived, she saw an American model green car with two African-American men enter the parking lot. The car almost hit her before speeding away. Ng wrote the license plate number of the car on a piece of paper and gave it to police. Police showed her some photo arrays, but Ng was unable to identify the robber that night.
 {¶ 6} Cincinnati Police Officer Cecilia Charron responded to the Marathon station within four minutes of receiving a dispatch for the robbery. Charron spoke with Cliff, who was visibly upset, and with Ng. Ng handed her a receipt with a license plate number for a dark green car that she had seen speeding through the parking lot.
 {¶ 7} Rachel Kendel, the assistant manager at the White Castle located across the street from the Marathon station, was working the late shift on the night of the Marathon robbery. Kendel was standing near an exit door, smoking a cigarette and waiting on a co-worker, Carmella Ballew, who was dumping garbage in the restaurant's dumpster, when she saw an African-American man walking back and forth in the restaurant's lighted parking lot. Although it was warm that night, Kendel noticed that the man was wearing a tan jacket, dark pants, and gloves; and he was carrying a long black winter hat. Kendel watched the man pace back and forth in the parking lot for five to seven minutes before walking towards the Marathon station across the street.
 {¶ 8} Thirty minutes later, police spoke to Kendel about the Marathon robbery. Kendel told police about the man she had seen that evening and gave them a copy of the restaurant's video surveillance. Still photographs from the video showed a man matching Kendel's description of the man she had seen in the White Castle parking lot prior to the Marathon robbery. Eleven days after the robbery, Cincinnati police showed Kendel three photo arrays. Kendel selected Harris's picture from one of the photo arrays, and she provided an in-court identification of Harris during the trial.
 {¶ 9} Marie Johnson and Ballew were also working the late shift at White Castle on the night of the robbery. Johnson remembered Kendel and Ballew smoking cigarettes outside that night and Kendel telling Ballew to come inside because something was going on. Johnson also recalled seeing a man in the parking lot through the window at the drive-through, but stated that she knew nothing about the robbery that night. Ballew remembered taking the trash out around 10:30 p.m. on the night of the robbery and then standing outside for three to five minutes while she and Kendel smoked cigarettes. When Ballew finished her cigarette, Kendel told her to come inside. Ballew could not recall seeing anything unusual that night, nor did she recall Kendel mentioning anything to her. When she left work around 11:00 p.m., Ballew saw Kendel talking with the police, but she did not know why.
 {¶ 10} Detective Christine Shircliff with the Cincinnati Police Department investigated the Marathon robbery. Using the license plate number Ng had provided to police, Shircliff was able to locate its owner, Timothy Clark. When Clark did not match the description of the robbery suspect, Shircliff told him that his car had been involved in a robbery. Shircliff later learned that Clark had loaned the car to Neron Costin on the night of the robbery, and that Harris had been with him.
 {¶ 11} Shircliff subsequently called the Bureau of Identification at the Hamilton County Sheriff's office and had it compile some photographic lineups. Harris's photo was placed in one photo array, while Costin's photo was placed in the other array. Shircliff subsequently showed the arrays to Cliff, Ng, and Kendel. Cliff and Ng were unable to make any identification. Shircliff then showed Kendel three photographic arrays. Kendel selected Harris's photograph.
 {¶ 12} Based on Kendel's positive identification, Shircliff signed a warrant for Harris's arrest in late October. Harris was ultimately apprehended on December 20, 2003. Shircliff interviewed Harris the following day at the Justice Center. After waiving his Miranda rights, Harris spoke with Detective Shircliff about the Marathon robbery. Harris initially told Shircliff that he was at a Bible study that night, which ended at 9:00 p.m., and that he was home by 10:00 p.m.
 {¶ 13} When Shircliff told Harris that Timothy Clark had seen him in his car that night with Neron Costin, and that witnesses had seen Clark's car leaving the scene of the robbery, Harris admitted to being in Clark's car with Costin on the night of the robbery. When Shircliff told Harris that someone had identified him as the robber, Harris asked Shircliff how that person could identify him if he had been wearing a mask. Shircliff told Harris that someone outside White Castle had seen him with a mask right before the robbery. Harris told Shircliff that he was not at the Marathon station without a mask on. Harris then said, "Never mind. No one saw me standing out there." Harris would not tell Shircliff if he was in the car when it sped through the Marathon parking lot. Harris told the detective that his daughter lived on Mitchell Avenue and asked her why he would rob the Marathon station when he had just purchased gas there several weeks earlier. Harris also told Shircliff that it was not his "MO" to rob stores. He said, "Look at my record." When Shircliff inquired about the gun charges on Harris's record, Harris told her that someone had left the gun by him.
 {¶ 14} Harris presented several alibi witnesses in his defense. Harris's brother, Lorenzo Harris, testified that he picked up Harris, who was wearing a green Boston Celtics jersey, around 7:00 p.m. on the night of the Marathon robbery, at his apartment in West Chester and drove him to the Garden of Gethsemane Church at 730 East McMillan Street for Bible study. When the Bible study ended at 8:30 p.m., Lorenzo and Harris drove to their parents' home and stayed there until 9:45 p.m., when Lorenzo drove Harris home. When Lorenzo dropped Harris off at his apartment, he saw Laquanda Jamison, Harris's girlfriend, peeping through the window. Lorenzo further testified that his brother was employed, did not smoke cigarettes or carry weapons, and did not own a ski mask.
 {¶ 15} Lynard Turner, the pastor at the Garden of Gethsemane Church, explained that his church was small, being comprised of only Harris's family and his family, which was why he recalled Harris and his brother, Lorenzo, attending the church's Bible study on October 15, 2003. Turner testified that Harris and his brother left the church around 9:00 p.m. Turner also testified that Harris had come to church on December 31, 2003, and that he had never seen Harris smoking cigarettes.
 {¶ 16} Neron Costin, a good friend of Harris's, testified that he borrowed Timothy Clark's car around 6:00 or 7:00 p.m. on the night of the Marathon robbery. Costin testified that he and Winfred Richardson drove Clark to a friend's house. Around 10:30 or 11:00 p.m., he and Richardson were driving on Mitchell Avenue when they forgot to pick up some beer for Clark, so they turned around in the Marathon parking lot. Costin testified that he almost hit a women in the parking lot, but that neither he nor Richardson got out of the car. Costin denied seeing Harris the night of the robbery. Costin admitted on cross-examination that he had recently been charged in another robbery involving the Shell station on Mitchell Avenue, and that he had a felony record.
 {¶ 17} Winfred Richardson testified that he, not Harris, was riding in the passenger seat of Clark's car on the night of the Marathon robbery. Richardson testified that he and Costin were driving in the car around 10:30 p.m. when they decided to stop and purchase gasoline and beer for Clark. When Richardson noticed that Costin was driving the wrong way on Mitchell Avenue, Richardson told Costin to turn the car around. Costin then made a quick U-turn in the Marathon station's parking lot, and they drove back to Evanston, where Clark was staying. On cross-examination, Richardson admitted that he had a felony record, and that he was a good friend of Harris's. Richardson also admitted that he was only 5 feet, 5inches tall and had three teeth missing in the front of his mouth.
 {¶ 18} Harris also presented an affidavit from Timothy Clark. In the affidavit, Clark stated that Harris was not with Costin when he loaned the car to Costin. Clark also denied telling the police that Harris was in the car with Costin on the night of the Marathon robbery. Clark further stated that he had never implicated Harris in the robbery.
Norwood UDF Robbery
 {¶ 19} On October 21, 2003, Kevin Lake and Emily Sikkema were working the evening shift at a UDF in the city of Norwood when a tall, young, African-American man wearing a black sweat suit and khaki boots came into the store. The man walked to the ice cream counter and asked Sikkema for the price of Newport cigarettes. Sikkema rang up the cigarettes and told the man the price. The man then told her that he wanted to purchase the cigarettes.
 {¶ 20} When Sikkema asked the man for his identification, the man pulled a gun from his waist, pointed it towards Sikkema, and told her to open the cash register. Sikkema had trouble opening the register, so the man pointed the gun towards Lake and told him to help Sikkema open the register. When Sikkema opened the register, the man took all the bills from the register and stuffed them in his pocket. The man then ordered Lake to open his register. He took the money from Lake's register as well and ran out of the store. As the man was leaving the store, he brushed Meredith Belle's shoulder. The man took approximately $170 and a pack of Newport cigarettes. Sikkema's and Lake's testimony was consistent with a video of the robbery taken from the store's surveillance system. Lake, Sikkema, and Belle told police that the robber had very noticeable acne or scarring on his face and large eyes.
 {¶ 21} Seven days after the robbery, Detective Mark Garner of the Norwood Police Department separately showed Lake, Belle, and Sikkema a photographic array that contained Harris's photo. All three identified Harris as the robber. At the hearing on Harris's motion to suppress and at trial, Belle recanted her identification, claiming that she had only chosen Harris's photograph because he looked familiar to her. Sikkema told police that she was not positive that Harris was the robber, but that she had picked the person in the lineup who had most resembled the robber.
 {¶ 22} Lake testified that Belle had approached him in the hallway during the trial and had told him that she believed Harris was the robber that day, but that she had changed her story because she had attended school with Harris and was afraid to testify against him. When later recalled by defense counsel, Belle admitted she had spoken with Lake, but testified that Lake had misunderstood her comments. She denied telling Lake that she was scared of testifying against Harris.
 {¶ 23} Laquanda Jamison testified that she and Harris lived together in an apartment in West Chester. She testified that Harris could not have committed the Norwood UDF robbery because Harris had spent the entire evening with her. Jamison testified that Harris picked her up from work at 3:00 p.m. They drove to a carwash and arrived home around 4:15 p.m. She made dinner, they watched television, and they went to bed between 9:00 and 10:00 p.m.
St. Bernard UDF Robbery
 {¶ 24} On October 22, 2003, Angela McGuire[1] and Nick Rosen were working the evening shift at the UDF in St. Bernard when a young African-American man wearing dark-colored pants, boots, a blue jacket, and a toboggan-style hat entered the store around 11:20 p.m. The man asked Rosen for a pack of Newport cigarettes. He then walked over to the ice cream counter, where he pulled a gun out of his pocket, pointed it at Rosen, and told Rosen to give him the money. The gunman told McGuire to move towards the registers. When McGuire did not move quickly enough, the man shoved the gun in her back and pushed her towards the registers. The gunman told both clerks to open their registers, to put the money in a plastic bag, and then to lie on the floor behind the registers.
 {¶ 25} When Rosen and McGuire thought the gunman had left, they started to get up. Rosen reached up to push the alarm button, but the gunman was still in the store. He walked back to the counter, grabbed the cigarettes, pointed the gun at both clerks, and yelled at them to stay down. When the gunman left the store, McGuire tripped the alarm and called for emergency assistance. The police arrived immediately thereafter. They interviewed Rosen and McGuire and reviewed the video of the robbery from the store's surveillance system. Five days later, McGuire and Rosen were shown a photographic array containing Harris's photo. Both clerks identified Harris as the robber. Neither McGuire nor Rosen could recall how much money had been stolen.
 {¶ 26} Harris presented an alibi for the robbery. His girlfriend, Laquanda Jamison, testified that Harris picked her up at her workplace around 3:00 p.m. He then drove her to a party store and to Walmart, where they both shopped for some items that they needed. On their way home, they stopped at a Pizza Hut and a Taco Bell. Jamison testified that when they arrived home, they ate dinner and then watched a movie before going to sleep.
Walgreens Robbery
 {¶ 27} On October 25, 2003, Mylan Stevens and Tia Batchelor were working the evening shift at the Walgreens store on Mitchell Avenue. Stevens was working in the camera department located in the back of the store. Batchelor was operating the cash register at the front of the store. Around 9:15 p.m., a young African-American man wearing a gray T-shirt over a long white shirt and blue jeans came into the store. The man had two white T-shirts covering his head and part of his face, and he was carrying a gun. The man told Batchelor to give him all the money. Batchelor told the gunman that she could not open the register, and that she needed another employee to help her. Batchelor then went to the stockroom, where she hid and called her grandmother.
 {¶ 28} In the meantime, Stevens had gone into the store office and was watching the robbery through a tinted window. He called the police, but the gunman left the store before they arrived. Although the store had a video surveillance system, an employee had failed to change the tape in the system on the morning of the robbery, so there was no videotape of the crime.
 {¶ 29} Detective Shircliff also investigated the Walgreens robbery. She testified that Harris fit the description of the robber, so, the day after the Walgreens robbery, she took a photo array containing Harris's photo to the store. She covered up the forehead and chin on each of the photos in the array before showing the array to Stevens. Stevens identified Harris as the robber. Shircliff also showed the array to Batchelor in a classroom at Cincinnati State. She again covered up the forehead and chin of each of the photos in the array. Batchelor also identified Harris as the robber. Harris was subsequently charged with the Walgreens robbery. When Shircliff interviewed Harris, he told her that he had been home the entire night.
 {¶ 30} Harris's girlfriend, Laquanda Jamison, testified that she and Harris had attended a party at her cousin's home on the night of the Walgreens robbery. Jamison testified that they arrived around 8:00 p.m. and stayed until 3:30 a.m. Jamison testified that they drove straight home from the party and went right to bed, and that Harris did not wake up until 3:00 or 4:00 the following afternoon.
 {¶ 31} The jury found Harris guilty of all the aggravated-robbery and robbery charges, as well as the accompanying gun specifications. The trial court merged the aggravated-robbery and robbery charges for the four incidents, sentenced Harris to the maximum prison term, ten years, for each of the aggravated-robbery charges, and ordered that the terms be served consecutively. The trial court merged the one-year gun specifications with the three-year gun specifications for each of the aggravated robberies, sentenced Harris to three years on each gun specification, and ordered that these terms be served consecutively to each other and to the ten-year prison terms for each of the aggravated robberies, for a total prison term of 52 years.
 II. Analysis {¶ 32} Harris raises six assignments of error for our review. In his first assignment of error, Harris contends that the trial court erred in failing to suppress identification evidence. In his second assignment of error, Harris contends that the trial court erred in denying his motion to sever the aggravated-robbery and robbery counts for each of the four incidents. In his third and fourth assignments of error, Harris contends that the trial court prejudiced his right to a fair trial when it permitted "other acts" testimony and hearsay testimony into evidence. In his fifth assignment of error, Harris challenges his convictions on both the sufficiency and the weight of the evidence. In his sixth assignment of error, Harris argues that the trial court erred as a matter of law by improperly sentencing him.
Motion to Suppress
 {¶ 33} In his first assignment of error, Harris argues that the trial court should have suppressed all three identifications in the Norwood UDF robbery, as well as Stevens's identification in the Walgreens robbery, because they involved impermissibly suggestive procedures and were unreliable.
 {¶ 34} "When a witness has been confronted with a suspect prior to trial, due process requires a court to suppress the witness's identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under the totality of the circumstances."[2] The defendant bears the burden of demonstrating that the identification procedure was unnecessarily suggestive. If the defendant meets this burden, the court must determine whether the identification, when viewed under the totality of the circumstances, is reliable despite the suggestive procedure.[3] But if the pretrial procedure was not unduly suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required.[4]
 {¶ 35} Harris contends that the photographic arrays that were shown to the witnesses in the Walgreens and Norwood UDF robberies were suggestive because the majority of the photographs depicted men who were too old to match the description provided by the witnesses to the robberies. We have examined the photographic arrays and cannot conclude that Harris's picture so stood out in the arrays as to suggest to witnesses that they should identify him as the perpetrator. The arrays, which were prepared by a computerized program, contained photographs that matched the descriptions provided by the witnesses to the robberies. Each of the arrays contained six pictures of African-American men of similar age and skin tone, with short hair, a mustache, and a goatee.
 {¶ 36} Nor can we conclude that the procedures employed by the police were unnecessarily suggestive. Prior to viewing the arrays, each witness was advised that the person who had committed the robbery may or may not have been pictured in the arrays. Each witness separately reviewed the arrays, and at no time during their viewing of the arrays did the police suggest which photo to choose. While Harris makes much of the fact that Detective Shircliff covered up the forehead and chin on his photo before showing the array to Stevens, we cannot conclude that this procedure alone made Stevens more likely to choose Harris's photograph, particularly when Shircliff did not single out Harris's photograph, but rather covered up the forehead and chin on each photograph in the array. Because we cannot conclude that the photographic arrays and the manner in which they were presented to the witnesses were unduly suggestive, we need not inquire into the reliability of the witnesses' identifications. Consequently, we overrule Harris's first assignment of error.
Motion for Relief from Prejudicial Joinder
 {¶ 37} In his second assignment of error, Harris claims that the trial court erred by overruling his motion for relief from prejudicial joinder.
 {¶ 38} Crim.R. 14 allows for separate trials on multiple counts in an indictment when joinder of the offenses would be prejudicial to the defendant. To preserve the issue of prejudicial joinder for appeal, however, the defendant must renew his motion at the close of all the evidence. When a defendant fails to renew his motion at the conclusion of all the evidence, he waives any error in the trial court's denial of the motion, unless the error rises to the level of plain error under Crim.R. 52(B).[5]
 {¶ 39} The record reveals that Harris failed to renew the motion at the close of the evidence. Consequently, he has waived any error in the trial court's denial of the motion for severance, unless the error rises to the level of plain error. Having reviewed the record, we cannot conclude that joinder of the aggravated-robbery offenses constituted plain error. The evidence of each aggravated robbery was simple and distinct.[6] The record reveals that the state presented the evidence of each aggravated-robbery separately, in a chronological fashion. Each of the offenses, which involved the robbery of a convenience store, occurred on a separate date and time and involved separate witnesses. The witnesses' testimony regarding each of the robberies was straightforward and uncomplicated. Thus, we find it improbable that the jury would have confused the evidence or considered one victim's testimony as corroborating evidence relating to one of the other aggravated-robbery charges. Because Harris has not demonstrated that the joinder of the aggravated-robbery offenses affected the outcome of the trial, we overrule his second assignment of error.
Other-Acts Evidence
 {¶ 40} In his third assignment of error, Harris argues that the trial court's admission of other-acts testimony violated Evid.R. 404 and prejudiced his right to a fair trial. Harris contends that the trial court erred in permitting Detective Shircliff to testify, over objection, that he had a prior criminal record that included gun charges, because the detective's testimony encouraged the jury to find him guilty on the basis of his past behavior rather than the specific facts of his case.
 {¶ 41} Generally, evidence of a defendant's "bad character" or propensity to engage in misconduct is prohibited by Evid.R. 404(A) where it is offered by the state to prove that the defendant committed the crime alleged.[7] Evid.R. 404(B), however, operates as an exception to the rule and provides that "[e]vidence of other crimes, wrongs, or acts * * * may * * * be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Thus, evidence of prior misconduct may be admissible where it is probative of such things as motive, intent, or identity.[8]
 {¶ 42} Based upon our review of the record, we agree with Harris that Detective Shircliff's statement constituted other-acts evidence. Shircliff's testimony did not fall under any of the exceptions in Evid.R. 404(B) and served no purpose other than to create the forbidden inference that Harris was guilty of the aggravated robberies because he had employed a gun in prior criminal acts.
 {¶ 43} But because the jury could have found Harris guilty of the robberies, irrespective of Shircliff's statements, we conclude that the trial court's admission of this testimony was harmless error.[9] Multiple eyewitnesses identified Harris as the perpetrator in each of the four robberies. Harris himself admitted that he had been wearing a mask at the Marathon station on the night of the robbery. Thus, the jury could have found him guilty of the Marathon robbery based on his statements alone. As a result, we overrule the third assignment of error.
Hearsay Statements
 {¶ 44} In his fourth assignment of error, Harris contends that the trial court's admission of several hearsay statements prejudiced his right to a fair trial.
 {¶ 45} Evid.R. 801 defines hearsay as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." With certain limited exceptions, hearsay is inadmissible.[10] Errors relating to the trial court's admission of hearsay evidence must be reviewed in light of Evid.R. 103(A) and the standard set forth in Crim.R. 52(A), which provide that such errors are harmless unless the record demonstrates that they affected a party's substantial rights.[11]
 {¶ 46} Harris first contends that the trial court erred by permitting Detective Shircliff to testify about statements that Ng and Clark had made to her during Shircliff's investigation of the Marathon robbery. With respect to Shircliff's testimony about Ng's out-of-court statements, the record reveals that the only hearsay testimony that came in during her testimony was solicited by defense counsel. During cross-examination, defense counsel told Shircliff that Ng had testified at trial that she did not see the car come through the Marathon parking lot until eight or nine minutes after the robbery. Counsel asked Shircliff whether she agreed with Ng's testimony. Shircliff responded by telling counsel that she disagreed with Ng's testimony. Shircliff then recounted what Ng had told her during the investigation. Because defense counsel solicited the hearsay testimony from Shircliff, any error in its admission was invited error.[12]
 {¶ 47} Regarding Shircliff's testimony about Clark's out-of-court statements, the record reveals that defense counsel made two hearsay objections during the state's direct examination of Shircliff, which the trial court sustained. Shircliff then proceeded to testify about some of Clark's out-of-court statements in response to defense counsel's questioning of her. Because defense counsel solicited these comments, he did not object or move to strike them. Shircliff's final hearsay statement came in during redirect examination. According to Shircliff, Clark told her that his vehicle had not been returned on the night of the robbery, and that Harris had come back to his house the day after the robbery, looking for a gun that he had left in the trunk of the car.
 {¶ 48} We agree with Harris that Shircliff's testimony about Clark's out-of-court statement was hearsay. But we cannot conclude that the outcome of his trial would have been different but for the admission of this testimony. Shircliff's comment about Clark's out-of-court statements was not so prejudicial that it rose to the level of plain error, particularly in light of Harris's own admissions that (1) he and Costin had been in Clark's vehicle on the day of the robbery, and (2) witnesses would not be able to identify him as the robber because he had been wearing a mask during the robbery, and in light of Kendel's eyewitness identification of him as the robber.
 {¶ 49} Harris further contends that Lake, one of the clerks in the Norwood UDF robbery, should have been prohibited from testifying about statements that Belle, the customer who had also witnessed the robbery, made to him about her identification and trial testimony. During redirect examination, Lake was permitted to testify about what Belle had told him in the hallway after her trial testimony. According to Lake, Belle believed that Harris was the person who had committed the UDF robbery, but had changed her testimony because she personally knew Harris and was afraid of him. The trial court overruled defense counsel's objection to this testimony, but permitted defense counsel to recross-examine Lake about the statements. The trial court also permitted the defense to recall Belle as a witness during its portion of the case and question her about Lake's statements.
 {¶ 50} Evid.R. 616(A) permits a witness to be impeached by a showing of bias, prejudice, interest, or any motive to misrepresent. Because Lake's testimony was offered for the purpose of showing Belle's bias and her motivation to lie about her identification of Harris as the perpetrator in the UDF robbery, it was admissible under Evid.R. 616(A). Thus, the trial court did not err in permitting this testimony. We, therefore, overrule Harris's fourth assignment of error.
Sufficiency and Weight of the Evidence
 {¶ 51} In his fifth assignment of error, Harris argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence, because the state failed to prove that he was the perpetrator in each of the four robberies. Harris bases his argument on the lack of physical evidence linking him to the robberies, the fact that the witnesses to each robbery gave varying descriptions of the robber's height and weight, and the fact that he presented a credible alibi defense for each of the robberies.
 {¶ 52} In reviewing the sufficiency of the evidence, this court must determine, after viewing the evidence in the light most favorable to the state, whether a rational trier of fact could have found that the essential elements of the offense had been proved beyond a reasonable doubt.[13] In determining whether a conviction was against the manifest weight of the evidence, this court "[reviews] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."[14]
 {¶ 53} Viewing the evidence in the light most favorable to the prosecution, we hold that a rational trier of fact could have found that the state had sufficiently proved beyond a reasonable doubt the elements of aggravated robbery, robbery, and the accompanying firearm specifications for each of the four incidents. Furthermore, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice in finding Harris guilty of the four robberies.
 {¶ 54} Multiple eyewitnesses identified Harris as the perpetrator of the four robberies from photographic arrays and at trial. Harris's own statements to police implicated himself in the Marathon robbery. While the witnesses to each robbery gave varying physical descriptions of the robber's height and weight, none of these variations positively excluded Harris as the robber. Furthermore, most, if not all, of the witnesses testified that their identification of Harris hinged more on his facial features than on his physical proportions, because Harris had very distinctive facial features, including scarring on his cheeks and large eyes. Thus, the mere fact that the witnesses gave varying descriptions of the height and weight of the robber did not render their overall descriptions so inaccurate and unreliable that we must overturn the jury's verdict.
 {¶ 55} Furthermore, while Harris presented alibi testimony from his brother, his pastor, and his two good friends that he was at church on the night of the Marathon robbery, as well as his girlfriend's testimony that he was with her on the night of the other three robberies, the jury apparently afforded little weight to their testimony. Given Harris's close relationship to these witnesses, the jury could have reasonably concluded that their testimony was not as credible or persuasive as the testimony provided by the state's witnesses. Because it was within the jury's province to determine whether to believe Harris's alibi evidence, we cannot say that the jury lost its way by not crediting the testimony of these witnesses. Because sufficient evidence existed to support Harris's convictions, and because the jury's verdict was not against the manifest weight of the evidence, we overrule Harris's fifth assignment of error.
Sentencing
 {¶ 56} In his sixth assignment of error, Harris argues that the trial court erred by sentencing him to the maximum prison term for each of the aggravated robberies, by imposing the terms consecutively, and by failing to advise him at the sentencing hearing that he would be subject to post-release control. Harris, relying upon this court's decision in State v. Bruce,[15]
also contends that the trial court's imposition of the maximum prison term for each aggravated robbery violated the right to a jury trial guaranteed under the Fifth Amendment to the United States Constitution.
 {¶ 57} In State v. Bruce, this court, applying the United States Supreme Court's decisions in Blakely v.Washington[16] and United States v. Booker,[17]
held that the maximum prison term the trial court could constitutionally impose for a first-degree felony was nine years, not ten, because the finding the trial court made to impose the tenth year of imprisonment — namely, that Bruce was among those offenders who had committed "the worst form of the offense" — involved "facts" that had to be found by a jury or admitted by Bruce.[18] Consequently, we held that R.C. 2929.14(A)(1) and 2929.14(C) were unconstitutional to the extent they allowed the trial court to increase a defendant's sentence in the absence of jury findings or admissions by the defendant.[19]
 {¶ 58} But in State v. Lowery, we acknowledged thatBlakely's prior-conviction exception permits a sentencing court to consider an offender's prior convictions without resubmitting the facts of those convictions to the jury.[20]
Consequently, we held that when the trial court's sentence is based upon factors that are concerned with the offender's potential for recidivism and that rely upon the offender's prior criminal history, the sentence does not violate the offender'sSixth Amendment rights.[21] With respect to maximum sentences, this court has further acknowledged that a trial court's finding under R.C. 2929.14(C)(2) — that an offender poses the greatest likelihood of recidivism — does not violateBlakely because it bears directly upon the offender's criminal history.[22]
 {¶ 59} The sentencing transcript reveals that the trial court made the requisite statutory findings prior to imposing the maximum prison term for each aggravated-robbery, and that its findings were supported by the record. Furthermore, the trial court's imposition of the maximum terms did not violateBlakely. The trial court's finding that Harris posed the greatest likelihood of committing future crime, which was based on his prior convictions, provided an independent ground to enhance Harris's sentences, irrespective of its "worst forms" findings.[23] Consequently, the trial court did not violate Harris's constitutional rights in imposing maximum sentences.
 {¶ 60} Harris also argues that the trial court erred in imposing consecutive sentences for the aggravated robberies because it did not make the statutorily required findings and did not provide its reasons for those findings. To impose consecutive sentences, a trial court must find that consecutive sentences are necessary to protect the public or to punish the offender. The trial court must also make one of the additional findings listed in R.C. 2929.14(E)(3) and provide its reasoning for those findings.[24] In State v. Comer, the Ohio Supreme Court held that a trial court must state the statutorily enumerated findings and give reasons supporting those findings at the sentencing hearing when imposing consecutive sentences.[25]
 {¶ 61} Here, the trial court not only failed to make the statutorily required findings, but also failed to provide on the record its reasons for imposing the consecutive sentences. Consequently, we sustain that portion of Harris's sixth assignment error that relates to the trial court's imposition of consecutive sentences.
 {¶ 62} Finally, Harris contends that the trial court erred at the sentencing hearing when it failed to inform him that he would be subject to post-release control. In State v. Jordan, the Ohio Supreme Court held that "a trial court has a statutory duty to provide notice of post-release control, at the sentencing hearing, [and that] any sentence imposed without such notification is contrary to law."[26] The Supreme Court further stated that "if an appellate court determines that a sentence is clearly and convincingly contrary to law, it may remand for resentencing. Furthermore, where a sentence is void because it does not contain a statutorily mandated term, the proper remedy is, likewise, to resentence the defendant."[27]
 {¶ 63} The state concedes that the trial court erred by failing to inform Harris at his sentencing hearing that he would be subject to post-release control. Because the trial court failed to notify Harris about post-release control and failed to make the necessary findings to impose consecutive sentences, we sustain that portion of Harris's sixth assignment of error challenging those aspects of his sentence. We, therefore, vacate the sentence imposed by the trial court and remand this case for resentencing in accordance with Comer and Jordan. Having found no merit to Harris's other assignments of error, we affirm the trial court's judgment in all other respects.
Judgment accordingly.
The court has recorded its own entry on the date of the release of this decision.
Gorman, P.J., and Hendon, J., concur.
[1] Her name also appears as Angel McGuire in portions of the record.
[2] State v. Beckham, 2d Dist. No. 19544, 2003-Ohio-3837, at ¶ 10.
[3] Manson v. Brathwaite (1977), 432 U.S. 98, 114,97 S.Ct. 2243; State v. Garner (1995), 74 Ohio St.3d 49, 61,656 N.E.2d 623.
[4] State v. Gomez, 3rd Dist. No. 16-04-10, 2005-Ohio-1606, at ¶ 34.
[5] State v. Bennie, 1st Dist. No. C-020497, 2004-Ohio-1264, at ¶¶ 21-22.
[6] Id., at ¶ 20.
[7] State v. Hirsch (1998), 129 Ohio App.3d 294, 306,717 N.E.2d 789.
[8] Id. at 306.
[9] See State v. Nettles, 8th Dist. No. 85637,2005-Ohio-4990, at ¶ 15 ("[A]n error in the admission of `other act' testimony is harmless when there is no reasonable possibility that the testimony contributed to the accused's conviction.").
[10] Evid.R. 802, 803, and 804.
[11] State v. Sutorius (1997), 122 Ohio App.3d 1, 7,701 N.E.2d 1.
[12] See State v. Nix, 1st Dist. No. C-030696, 2004-Ohio-5502, at ¶ 37.
[13] State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus.
[14] State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541.
[15] 159 Ohio App.3d 562, 2005-Ohio-573, 824 N.E.2d 609.
[16] (2004), 542 U.S. 296, 159 L. Ed. 2d 403, 124 S.Ct. 2531.
[17] (2005), 125 S.Ct 738, 160 L.Ed.2d 621, 543 U.S. 220.
[18] Id. at ¶¶ 9-10.
[19] Id. at ¶ 14.
[20] 160 Ohio App.3d 138, 2005-Ohio-1181, 826 N.E.2d 340, at ¶ 43; see, also, State v. McIntosh, 160 Ohio App.3d 544,2005-Ohio-1760, 828 N.E.2d 138.
[21] Lowery, supra, at ¶ 44.
[22] See State v. Deters, 1st Dist. No. C-010645,2005-Ohio-4049, at ¶ 19; see, also, McIntosh, supra, at ¶ 11.
[23] See Lowery, supra, at ¶ 46.
[24] R.C. 2929.14(E)(4).
[25] 99 Ohio St.3d 463, 2003-Ohio-4165, 793 N.E.2d 473, at ¶ 20.
[26] 104 Ohio St.3d 21, 2004-Ohio-6085, 817 N.E.2d 864, at ¶ 23.
[27] Id.