DECISION
{¶ 1} In May 2004, defendant-appellant David Harris was charged with juvenile delinquency in connection with the shooting deaths of David Hutchinson and George Vance. The complaint charged Harris, who was fourteen years old, with committing acts that constituted aggravated murder and aggravated robbery. The juvenile court subsequently found probable cause to believe that Harris had committed the acts charged in the complaint. Following a hearing, the juvenile court transferred jurisdiction of Harris's case to the Hamilton County Court of Common Pleas.
 {¶ 2} Harris was subsequently indicted as an adult for the aggravated murder and aggravated robbery of Hutchinson and the murder and aggravated robbery of Vance. A jury found Harris not guilty of the aggravated murder of Hutchinson, but guilty of the lesser-included offense of murder. The jury also found Harris guilty of the aggravated robbery of David Hutchinson and the accompanying gun specifications. The jury, however, acquitted Harris of the murder and aggravated robbery of Vance. The trial court sentenced Harris to fifteen years to life for murder, to nine years for aggravated robbery, and to three years for the merged gun specifications, with the sentences to be served consecutively. Harris now appeals his convictions, raising four assignments of error. Having found no merit in any of his assignments of error, we affirm the judgment of the trial court.
 FACTS {¶ 3} Shortly before midnight on May 13, 2004, Gary Chalk was walking along Elder Street in Cincinnati when he met his friend David Hutchinson. After talking, the two decided to walk towards Findlay Market to engage the services of some prostitutes in the area. As they passed Republic Street, they realized someone was walking behind them. When a man called out to them, both men turned around and saw Harris and Richard White.
 {¶ 4} Harris and White approached, and confrontational words were exchanged among the four men. Harris pulled out a pistol and pointed it at Hutchinson's face. Harris then told Hutchinson to "give that shit up." Chalk, realizing they were being robbed, put his hands in the air. When Chalk realized that White and Harris were focusing solely on Hutchinson, he began to back away slowly. When he had backed far enough away to feel safe, Chalk ran down an alley and through a park. As he ran, he heard gunshots fired in close succession, but he did not return to the scene. The next day, Chalk spoke with Hutchinson's sister, who convinced him to talk to the police about the shooting. Chalk told police that Harris had been holding the gun the night of the robbery and murder, and identified him from a photographic lineup.
 {¶ 5} Kenneth Fairbanks, one of Harris's friends, also spoke with police. He told them that around midnight on May 13, 2004, he had been walking along Elder Street with his friend Richard, when he saw some men scuffling with Hutchinson. Although Fairbanks had earlier testified in juvenile court that he had seen Harris rob Hutchinson while armed with a gun, he recanted this testimony in the adult trial and stated that he could not see who had robbed and shot Hutchinson because the person's face had been obscured by the hood of a sweatshirt. He stated that he had only named Harris as the perpetrator because the police had scared him. Fairbanks also testified that James Cody had contacted him and told him to get rid of a gun. Fairbanks stated that he drove Cody and two other friends to the Eighth Street Bridge in Price Hill. Once there, the gun was thrown from the car into the Millcreek.
 {¶ 6} James Cody testified that he had been Harris's friend for several years and that he also knew David Hutchinson. Cody told police that he knew about Hutchinson's murder as well as the murder of a second man, George Vance. Cody told police that on May 17, 2004, the day of Vance's murder, he was near a lot at 15th and Race Streets. Around 4 p.m., he saw Harris and Vance standing and talking in the lot. Cody said that Vance had marijuana in his hand. Cody saw Harris snatch the marijuana from Vance's hand and immediately run from the scene. Vance ran after Harris. Cody said he thought that Vance caught up with Harris, but that he was not sure. When asked whether Vance had caught him, Cody testified, "I think so. I don't know." Although Cody could not see exactly what happened next, he said that he heard a gunshot. He saw Vance fall to the ground and try to get up. Vance fell down three times before succumbing to his wounds. Cody said that after he heard the gunshot, "[e]verybody took off running."
 {¶ 7} Antonio Crooms and Brandon Waldron were playing basketball in a church parking lot near where the shooting occurred. The two heard a gunshot in the direction of the lot and afterwards saw a man with a gun running by them in an alley. Crooms, who was only nine years old, testified that he had seen the man several times before, but did not know his name. When police showed Crooms a photographic array, he identified Harris as the man he had seen in the alley. Waldron also identified Harris in a photographic lineup and at trial.
 {¶ 8} Thirty minutes after Vance's murder, Cody went to Richard White's home. Harris arrived and stated that "somebody [had] got shot." At trial, Cody was asked about a statement he gave police regarding this conversation with Harris. The prosecutor asked Cody if he had told the police in his taped statement that Harris had told him that he had shot Vance because Vance had tried to choke Harris after Harris had grabbed Vance's marijuana. Cody at first denied saying that, but later stated that he "didn't remember" saying it. On re-direct, he admitted that he had made that statement.
 {¶ 9} Cody also testified that he had spoken with Harris about Hutchinson's murder. Cody said that Richard White had wanted to rob somebody and asked Harris to join him because he knew Harris had a gun. Harris said that he had shot Hutchinson in the leg and that Hutchinson had run away. Harris told Cody that two more shots were fired after this, but that he did not kill Hutchinson.
 {¶ 10} Several days later, Cody received a phone call asking him to get rid of Harris's gun. Cody knew that Harris kept the gun in the basement of a building on Republic Street, so he and a man called "Little Rick" went to the building. Little Rick retrieved the gun. Cody and Little Rick then met White and Fairbanks. Cody testified that they drove to the Eighth Street Bridge and threw the gun into the Millcreek.
 {¶ 11} Deputy Coroner Cynthia Gardner testified that she examined the body of David Hutchinson. She found two gunshot wounds: one in the left upper back, which was fatal, and one on his left buttock. Due to the lack of gunpowder or stippling, Dr. Gardner concluded that both shots had been fired at a distance of greater than two feet. She stated that Hutchinson had probably had his back to the gun when it was fired. She retrieved two bullets from Hutchinson's body.
 {¶ 12} Chief Deputy Coroner Gary Utz examined the body of George Vance. He testified that he had recovered a bullet that had entered the left torso of Vance, causing his death. Utz testified that he had also found blunt-force trauma to Vance's head.
 {¶ 13} The recovered bullets, all .32 mm, were forwarded to Bill Schrand, the senior firearms examiner for the Hamilton County Coroner's Crime Laboratory. Schrand examined the gun, which police had retrieved from the Millcreek, along with the bullets. He concluded to a reasonable degree of scientific certainty that all the autopsy bullets had been fired from that gun.
 {¶ 14} On May 22, 2004, after learning that police were looking for him, Harris turned himself in at a juvenile detention facility. Harris was placed in custody and transported to police headquarters. After answering some preliminary questions and orally waiving his Miranda rights, Harris was interviewed. Harris told police that Hutchinson had approached him one year earlier and had begun choking him. He said that while Hutchinson was choking him, Hutchinson had said, "I'll kill you."
 {¶ 15} On the night of Hutchinson's murder, Harris told police, he had tried the drug Ecstasy for the first time, taking it approximately one hour before the shooting. Harris told police that he was with White and Fairbanks when they saw Hutchinson. Harris stated that White had called Hutchinson over, and the robbery began. While White was removing items from Hutchinson's pockets, Harris remembered Hutchinson from the choking incident, so he asked Fairbanks for a gun. Harris admitted to shooting Hutchinson once in the leg, but stated that he then gave the gun back to Fairbanks. Harris said that Hutchinson had started running away, and that Fairbanks fired the gun towards his back and shot him twice. Harris denied any involvement in George Vance's murder.
 ANALYSIS {¶ 16} In his first assignment of error, Harris contends that the trial court erred in failing to remand his case to the juvenile court. Harris contends that he should have been treated as a serious youthful offender who, if convicted, would have been subject to a blended juvenile-adult sentence.
 {¶ 17} The fundamental flaw in Harris's argument is that there is no statutory mechanism for a common pleas court to return a case to a juvenile court once the juvenile court has relinquished jurisdiction. The Revised Code specifically provides that once the juvenile court has transferred a case to the common pleas court, it has no further jurisdiction to hear or determine a child's case.[1] Ohio courts have further held that when a juvenile has been bound over to the common pleas court, the common pleas court has no jurisdiction to review the bindover order for error.[2] We, therefore, overrule Harris's first assignment of error.
 {¶ 18} In his second assignment of error, Harris argues that the trial court's denial of his motion to sever the charges related to each of the victims prejudiced his right to a fair trial.
 {¶ 19} "Crim.R. 14 allows for separate trials on multiple counts in an indictment when joinder of the offenses would be prejudicial to the defendant. [Citations omitted.] To preserve the issue of prejudicial joinder for appeal, however, the defendant must renew his motion at the close of all the evidence. When a defendant fails to renew his motion at the conclusion of all the evidence, he waives any error in the trial court's denial of the motion, unless the error rises to the level of plain error under Crim.R. 52(B). [Citations omitted.]"[3]
 {¶ 20} Harris's counsel failed to renew the motion for separate trials at the conclusion of all the evidence, thus waiving all but plain error. Based on our review of the record, we cannot conclude that the trial court's joinder of the counts relating to both victims rose to the level of plain error. Both murders occurred only four days apart, in geographical proximity to each other. Both involved the robberies of young men in their twenties and deaths resulting from gunshots allegedly fired by Harris. Furthermore, the same gun was used in both murders. The trial court could have concluded that financial gain or need was the motive in each murder. Because evidence of either murder would have been admissible as part of a common scheme or plan under Evid.R. 404(B), Harris has not demonstrated that the joinder prejudiced his right to a fair trial. Moreover, the fact that the jury acquitted Harris of the murder and aggravated robbery of Vance shows that the jury independently weighed the evidence in each case and gave due consideration to the facts of each crime.[4] We, therefore, overrule Harris's second assignment of error.
 {¶ 21} In his third assignment of error, Harris argues that the trial court should have suppressed his statement to police, because his age and his mental deficiency prevented him from voluntarily waiving his Miranda rights.
 {¶ 22} In determining whether a juvenile's statements have been involuntarily induced, this court must consider the totality of the circumstances, which includes "the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of interrogation; and the existence of physical deprivation or inducement."[5] In State v. Evans, this court held that "special care must be taken when evaluating the totality of the circumstances surrounding a juvenile's confession."[6] We stated that when a "juvenile's counsel [is] not present for some permissible reason, `the greatest care must be taken to assure that the admission was voluntary in the sense that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright, or despair.'"[7]
 {¶ 23} The record in this case reveals that Harris was in custody at a juvenile-detention facility. He was then transported to police headquarters, where he was interviewed by two detectives. Prior to the interview, the detectives introduced themselves and showed Harris a copy of a Miranda-rights waiver form. Harris told the detectives that he had not taken alcohol or drugs in the last 24 hours and that he had completed the sixth grade, so he could read and write to some extent. At the detectives' request, Harris read the Miranda-rights form out loud to them. Harris acknowledged that he understood his rights and had no questions about them, but he refused to sign a written waiver of his rights. Harris agreed to speak to police, but he asked that the interview not be tape recorded.
 {¶ 24} Harris was interviewed for a short period of time. One detective testified that Harris's speech was not slurred, that his responses to questions were appropriate, and that he could not smell alcohol on Harris's breath. At no time during the interview did Harris ask either to stop the questioning or to have an attorney or his parents present. The detective further testified that he was surprised to hear that Harris's IQ placed him in the mildly mentally retarded range, because Harris appeared to be normal to him.
 {¶ 25} Because the totality of the circumstances belies Harris's arguments that his age and mentality prevented him from understanding the rights he was waiving, we cannot conclude that the trial court erred in determining that Harris's statements were given voluntarily. We, therefore, overrule his third assignment of error.
 {¶ 26} In his fourth assignment of error, Harris challenges his convictions for the aggravated robbery and murder of Hutchinson on both the sufficiency and the weight of the evidence.
 {¶ 27} When reviewing a defendant's claim that his criminal conviction is not supported by sufficient evidence, this court must determine whether the evidence presented at trial, when viewed in the light most favorable to the prosecution, could have allowed a rational trier of fact to find the essential elements of the crime proved beyond a reasonable doubt.[8] In determining whether a defendant's conviction is against the manifest weight of the evidence, this court "[reviews] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."[9]
 {¶ 28} Having reviewed the record, we cannot conclude that Harris's convictions for murder and aggravated robbery were against the sufficiency or the manifest weight of the evidence. Chalk testified that he was walking with Hutchinson on the night of the murder when Harris and White approached them. Chalk, who knew both White and Harris, saw Harris pull out a gun and tell Hutchinson to "give up that shit." As Chalk was backing away from the robbery, he saw Harris pointing the gun at Hutchinson. Shortly thereafter, Chalk heard three gunshots being fired in rapid succession. While Harris admitted to participating in the robbery and to firing one gunshot in Hutchinson's leg, the coroner's examination revealed only two gunshot wounds to Hutchinson's body, both of which were found in Hutchinson's torso. And while Harris maintained that Fairbanks had fired the fatal shots, there was simply no evidence before the jury to support this assertion.
 {¶ 29} Moreover, the state had physical evidence linking Harris to the crimes. Cody testified that Harris had contacted him, asking him to dispose of the murder weapon. Cody and Fairbanks both testified that they drove to the Eighth Street Bridge with two other men and threw the gun into the Millcreek. Police subsequently recovered a gun from the Millcreek. The state presented expert testimony that the bullets taken from Hutchinson's body had been fired from the gun that the police had recovered.
 {¶ 30} Because sufficient evidence existed to support Harris's convictions, and because the jury's verdict was not against the manifest weight of the evidence, we overrule Harris's fourth assignment of error. Having found no merit in any of Harris's assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
Doan, P.J., and Hendon, J., concur.
[1] R.C. 2152.12(I) and 2151.23(H).
[2] State v. Whiteside (1982), 6 Ohio App.3d 30, 37,452 N.E.2d 332; State ex rel. Torres v. Simmons (1981),68 Ohio St.2d 118, 119, 428 N.E.2d 332.
[3] State v. Harris, 1st Dist. No. C-040483, 2005-Ohio-6995, at ¶ 38.
[4] State v. Echols (2001), 146 Ohio App.3d 81, 88-89,765 N.E.2d 379; State v. Bennie, 1st Dist. No. C-020497,2004-Ohio-1264, at ¶ 23.
[5] State v. Evans (2001), 144 Ohio App.3d 539, 560,760 N.E.2d 909, quoting In re Watson (1989), 47 Ohio St.3d 86,548 N.E.2d 210.
[6] Id. at 561-562, quoting In re Gault (1967), 387 U.S. 1,55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527.
[7] Id.
[8] State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[9] State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.